**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

UNITED STATES OF AMERICA,
            *Plaintiff-Appellee,*

            v.

RONALD WEBSTER HENDERSON,
            *Defendant-Appellant.*

No. 09-50544

D.C. No.
8:08-cr-00174-AG-1

OPINION

Appeal from the United States District Court
for the Central District of California
Andrew J. Guilford, District Judge, Presiding

Argued and Submitted
December 8, 2010—Pasadena, California

Filed April 29, 2011

Before: Betty B. Fletcher, Marsha S. Berzon, and
Consuelo M. Callahan, Circuit Judges.

Opinion by Judge B. Fletcher;
Concurrence by Judge Berzon;
Concurrence by Judge Callahan

5597

**COUNSEL**

Sean K. Kennedy, Federal Public Defender, and James H. Locklin, Deputy Federal Public Defender, Los Angeles, California, for the defendant-appellant.

Andre Bitotte Jr., United States Attorney, Denisse D. Willett, Assistant United States Attorney, and Anne C. Gannon, Assistant United States Attorney, Santa Ana, California, for the plaintiff-appellee.

**OPINION**

B. FLETCHER, Circuit Judge:

Ronald Henderson challenges the district court's failure to exercise the discretion accorded it in *Kimbrough v. United States,* 552 U.S. 85 (2007), to vary from the Sentencing Guidelines based on policy disagreements with them and not simply based on an individualized determination that they yield an excessive sentence in a particular case. Because it is unclear whether the district judge recognized and exercised his *Kimbrough* discretion, we reverse and remand for resentencing.

BACKGROUND

An FBI agent, working undercover, used the peer-to-peer network software "Limewire" to view lists of images and videos located on Ronald Henderson's computer and available for downloading. The agent downloaded approximately 15 files containing child pornography from Henderson's computer. Agents then executed a search warrant at Henderson's residence. The agents seized four computers and various other digital storage devices. The file sharing function was enabled on Henderson's laptop computer that contained the "Limewire" software.

At the time of the search, Henderson made numerous statements to the agents. Henderson stated that he had child pornography and that he was the one who put it on his laptop computer. He said he understood that possession of child pornography is a crime. He revealed that he is bipolar but that he was not then taking medication. He also told the agents that he is obsessed with completing collections—for example, he collects recordings by the Rolling Stones, as well as coins.

Henderson further stated that he had been collecting child pornography for about two years. He catalogued his collection and saved the child pornography files on numerous CDs, some of which contained over a thousand images. His preference was for female teenagers between 13 and 15 years old. Henderson also stated that he knew that he was sharing his files and, in fact, noticed people downloading child pornography from his computer. In total, the files that Henderson offered for sharing consisted of 8,765 video and image files, of which approximately 80 were of identified victims. Eleven of those files were video files, some of them depicting prepubescent girls engaged in sexual acts.

During the search, the agents also discovered two photographs in an envelope. They were pictures of two girls under the age of 18 whom Henderson admitted to having picked up

in Oregon some ten years before. Henderson brought them
with him to his apartment in Huntington Beach, California.
Although Henderson wanted to have sex with them, he was,
he said, "a gentleman"— apparently meaning that he did not
have sex with them. When the girls did not do housework,
Henderson bought them bus tickets and sent them back to
Oregon, some two weeks after he had picked them up.

Henderson pled guilty to the single count in the indictment,
possession of child pornography in violation of 18 U.S.C.
§ 2252(a)(5)(B). In preparation for sentencing, the United
States Probation Office prepared a presentence investigation
report (PSR). Using the child pornography Guideline,
U.S.S.G. § 2G2.2, the PSR calculated the offense level at 18.
The PSR added two levels because Henderson's files con-
tained at least one prepubescent minor, pursuant to
§ 2G2.2(b)(2); two levels because the offense involved distri-
bution, pursuant to § 2G2.2(b)(3); four levels because the
offense involved material that portrays sadistic or masochistic
conduct or other depictions of violence, that is, vaginal pene-
tration of prepubescent minors, pursuant to § 2G2.2(b)(4);
two levels because the offense involved the use of a com-
puter, pursuant to § 2G2.2(b)(6); and five levels because the
offense involved 600 or more images, pursuant to
§ 2G2.2(b)(7). The PSR deducted three levels for acceptance
of responsibility, resulting in a total offense level of 30.

Henderson had three criminal-history points based on two
drug-related convictions, placing him in criminal history cate-
gory II.

Based on a total offense level of 30 and a criminal history
II, the PSR calculated Henderson's sentencing range to be 108
to 120 months, with the high end limited by the 10-year statu-
tory maximum.

The probation officer recommended that Henderson be sen-
tenced to 70 months imprisonment followed by a lifetime

term of supervised release. The probation officer relied heavily for her recommendation on Henderson's significant history of physical and sexual abuse and neglect, and on the role that his mental health disorder played in the offense. She explained that after the death of his father following a car accident in which he was a passenger, Henderson was first raped when he was five years old, by an adult male, while on a religious retreat. When he was seven, Henderson was physically and sexually abused by his mother's boyfriend. The man forced Henderson into bed naked and forced him to attempt to have sex with his mother. Later, as a teen, Henderson was molested by a group of older female teens. After his mother was deemed unfit to raise him, Henderson was placed in a series of foster homes. In one of those homes, Henderson was sexually molested by his foster mother when he was between 16 and 18 years old.

The probation officer also noted that Henderson was hospitalized for manic episodes twice in 1995, as well as twice in 1997. During that time, he was diagnosed with bipolar disorder I (the most extreme form) and prescribed psychiatric medication. Between 2003, when he was released from jail, and 2008, when he was placed on pretrial supervision for the instant offense, Henderson did not have access to medication.

The probation officer reported that Henderson also has secondary symptoms of obsessive compulsive disorder, that caused Henderson to search out, collect, and catalogue entire sets of documents, memorabilia, and information. The officer explained that it is unknown the exact degree to which Henderson's obsessive compulsive disorder contributed to his offense, but that it may have resulted in his accumulating more and more diverse types of child pornography than he may have otherwise acquired. The probation officer opined that this factor distinguished Henderson from other defendants.

In its sentencing memorandum, the government requested that the district court sentence Henderson to a low-end Guide-

lines sentence of 108 months and a lifetime term of supervised release.

Henderson requested that he be sentenced to 36 months imprisonment followed by a seven-year term of supervised release. Citing *Kimbrough v. United States*, 552 U.S. 85 (2007), he argued that the child pornography Guideline, U.S.S.G. § 2G2.2, should be given little weight because it was not developed following an empirical approach but in response to Congressional directives, and does not comport with 18 U.S.C. § 3553(a) even in a mine-run case. Henderson also argued that the § 3553(a) factors warranted a reduced sentence because of his childhood abuse and history of mental illness.

The government responded that § 2G2.2 was properly based on Congressional directives that sentencing courts are not free to ignore.

At the sentencing hearing, the district court judge stated it was the first time he had encountered the *Kimbrough* argument. He said:

> I'm going to need direction from the Ninth Circuit before I accept those other arguments, so perhaps you can include this in the appeal. I'm not accepting the argument you made along those lines, but I am going to vary and looking at the chart and looking at my past conduct in similar cases I believe a three-level downward variance is in order, giving us a range of 78 to 97 months, and I will pick the low end of that which is 78 months, which is a three-level variance, a variance that tends to be relatively high compared to my usual practices in these cases but I think is justified particularly by the history and characteristics of the defendant here.

The district court imposed a 78-month sentence followed by a lifetime term of supervised release.

Henderson argues that his sentence is procedurally errone-ous due to the district court's refusal to accept his *Kimbrough* argument absent guidance from this court. He also argues that the sentence is substantively unreasonable.

## STANDARD OF REVIEW

Our review of sentencing decisions is limited to determin-ing whether they are reasonable. *Gall v. United States*, 552 U.S. 38, 46 (2007). Only a procedurally erroneous or substan-tively unreasonable sentence will be set aside. *United States v. Apodaca*, No. 09-50372, ___ F.3d ___, 2011 WL 1365794, at *2-3 (9th Cir. April 12, 2011); *United States v. Carty*, 520 F.3d 984, 993 (9th Cir 2008).

In reviewing sentences for reasonableness, we "must first ensure that the district court committed no significant proce-dural error, such as . . . treating the Guidelines as mandatory . . . ." *Gall*, 552 U.S. at 51. Assuming that the district court's sentencing decision is procedurally sound, we then consider the substantive reasonableness of the sentence imposed under an abuse-of-discretion standard. *Id*.

In applying this standard, we review the district court's interpretation of the Sentencing Guidelines de novo, its appli-cation of the Guidelines to the facts for abuse of discretion, and its factual findings for clear error. *United States v. Garro*, 517 F.3d 1163, 1167 (9th Cir. 2008).

## DISCUSSION

### I. *Kimbrough* Sentencing Discretion

In *Kimbrough v. United States*, 552 U.S. 85 (2007), the Supreme Court considered whether district courts have authority to consider the disparity between the Sentencing Guidelines' treatment of crack and powder cocaine offenses when deciding on a sentence. *Id*. at 91. In its analysis, the

Court emphasized that while the Sentencing Guidelines are advisory, the Sentencing Commission continues to hold a key role in the criminal system. *Id*. at 108. Sentencing courts must treat the Guidelines as the " 'starting point and the initial benchmark.' " *Id*. at 108 (quoting *Gall*, 552 U.S. at 49). Congress established the Commission to formulate and constantly refine national sentencing standards. *Id*. Carrying out its charge, the Commission "fills an important institutional role: It has the capacity courts lack to base its determinations on empirical data and national experience, guided by a professional staff with appropriate expertise." *Id*. at 108-09 (internal quotations omitted). Therefore, "in the ordinary case, the Commission's recommendation of a sentencing range will 'reflect a rough approximation of sentences that might achieve § 3553(a)'s objectives.' " *Id*. at 109 (quoting *Rita v. United States*, 551 U.S. 338, 350 (2007)). The Court nonetheless recognized that sentencing judges have "greater familiarity with . . . the individual case and the individual defendant before him than the Commission or the appeals court." *Id*. (quoting *Rita*, 551 U.S. at 357-58). In light of these "discrete institutional strengths," the Court held that different levels of deference are due a sentencing court's decision to vary from the Guidelines based on its reason for doing so:

> [A] district court's decision to vary from the advisory Guidelines may attract greatest respect when the sentencing judge finds a particular case "outside the 'heartland' to which the Commission intends individual Guidelines to apply." *Rita*, 551 U.S., at 351, 127 S. Ct., at 2465. On the other hand, while the Guidelines are no longer binding, closer review may be in order when the sentencing judge varies from the Guidelines based solely on the judge's view that the Guidelines range "fails properly to reflect § 3553(a) considerations" even in a mine-run case. *Ibid*. . . .

*Id*. at 109.

The Court held, however, that the crack-cocaine Guidelines "present no occasion for elaborative discussion of this matter because those Guidelines do not exemplify the Commission's exercise of its characteristic institutional role." *Id*. In formulating the Guideline ranges for crack cocaine offenses, the Commission looked to the mandatory minimum sentences for cocaine offenses, which adopted a ratio that treated every gram of crack cocaine as the equivalent of 100 grams of powder cocaine, and did not take account of empirical data and national experience. *Id*. Yet the Commission itself has reported that the crack/powder disparity produces disproportionately harsh sanctions, *i.e.*, sentences for crack cocaine offenses "greater than necessary" in light of the purposes of sentencing set forth in § 3553(a). *Id*. at 110. The Court therefore held that "it would not be an abuse of discretion for a district court to conclude when sentencing a particular defendant that the crack/powder disparity yields a sentence 'greater than necessary' to achieve § 3553(a)'s purposes, even in a mine-run case." *Id*.

**[1]** In *Spears v. United States*, 555 U.S. 261, 129 S. Ct. 840 (2009), the Court clarified that "*Kimbrough* . . . holds that with respect to the crack cocaine Guidelines, a categorical disagreement with and variance from the Guidelines is not suspect." *Id*. at 843. The Court emphatically stated: "That was indeed the point of *Kimbrough*: a recognition of district courts' authority to vary from the crack cocaine Guidelines based on policy disagreement with them, and not simply based on an individualized determination that they yield an excessive sentence in a particular case." *Id*. at 842-43.

**[2]** *Kimbrough*'s rationale is not limited to the crack-cocaine Guidelines. *See United States v. Mitchell*, 624 F.3d 1023, 1030 (9th Cir. 2010) ("As the Supreme Court through *Booker*, *Kimbrough*, and *Spears* has instructed, and as other circuits that have confronted the crack/powder variance in the sentence of a career offender have accepted and clarified in their circuit law, sentencing judges can reject *any* Sentencing

Guideline, provided that the sentence imposed is reasonable.") (emphasis in original). *See also United States v. Corner*, 598 F.3d 411, 415 (7th Cir. 2010) ("We understand *Kimbrough* and *Spears* to mean that district judges are at liberty to reject *any* Guideline on policy grounds—though they must act reasonably when using that power.") (emphasis in original). Moreover, as we will now explain, the history of the child pornography Guidelines reveals that, like the crack-cocaine Guidelines at issue in *Kimbrough*, the child pornography Guidelines were not developed in a manner "exemplify-[ing] the [Sentencing] Commission's exercise of its characteristic institutional role." *Kimbrough*, 552 U.S. at 109, so district judges must enjoy the same liberty to depart from them based on reasonable policy disagreement as they do from the crack-cocaine Guidelines discussed in *Kimbrough*.

II.   The History of the Child Pornography Guidelines

"Much like policymaking in the area of drug trafficking, Congress has used a mix of mandatory minimum penalty increases and directives to the Commission to change sentencing policy for sex offenses." U.S. Sentencing Comm'n, *Fifteen Years of Guidelines Sentencing: An Assessment of How Well the Federal Criminal Justice System is Achieving the Goals of Sentencing Reform* 72 (2004) ("*Fifteen-Year Assessment*"), http://www.ussc.gov/15_year/15_year_study_full.pdf.

At the inception of the Guidelines, simple possession of child pornography was not a crime and the relevant Guideline, § 2G2.2, was limited to "transporting, receiving, or trafficking" offenses. *See* U.S.S.G. § 2G2.2 (1987). The base offense level for these crimes was 13. *See id*. The crimes of possession and possession with intent to sell were added in 1990. *See* Crime Control Act of 1990, Pub. L. 101-647, § 323, 104 Stat. 4789, 4818-19 (1990).

The Commission responded by adding a new Guideline at § 2G2.4 to address receipt or possession of child pornogra-

phy, while trafficking continued to be covered by § 2G2.2. U. S. Sentencing Comm'n, *The History of the Child Pornography Guidelines* 18-19 (2009) ("*Child Porn. History Rep't*"), http://www.ussc.gov/full.pdf. Following those amendments, the base offense level for trafficking offenses was 13, to be increased by two levels if the material involved a prepubescent minor or a minor under the age of twelve years; by up to five levels if the offense involved distribution; and by four levels if the material portrayed sadistic or masochistic conduct or other depictions of violence. *See* U.S.S.G. App. C, amend. 372 (Nov. 1, 1991). The base offense level for receipt or possession was 10 and there was a two-level enhancement if the material involved a prepubescent minor or a minor under the age of twelve. *See id.*

In 1991, over the objection of the Commission, *see Child Porn. History Rep't* at 20-21, Congress directed the Commission to increase penalties for child pornography offenses. *See* Treasury, Postal Service and General Government Appropriations Act, 1992, Pub. L. No. 102-141, § 632, 105 Stat 834, 876 (1991). Among other things, Congress explicitly ordered the Commission to include receiving pornography in the Guidelines section that governed trafficking and transporting; to increase the base offense level for receiving, transporting, and trafficking to at least 15, and to add a five-level enhancement for such offenses for patterns of activity involving the sexual abuse or exploitation of a minor; and to increase the base offense level for possession to at least 13 and to add to this offense enhancements for the number of items possessed. *See Child Porn. History Rep't* at 23-24; General Government Appropriations Act § 632.

In response to these congressional directives, the Commission amended § 2G2.2 by providing that receipt offenses were to be sentenced under § 2G2.2, raising the base offense level from 13 to 15, and adding a five-level pattern of activity enhancement. U.S.S.G. App. C, amend. 435 (Nov. 27, 1991). The Commission also amended § 2G2.4 by limiting it to pos-

session of child pornography, raising the base offense level from 10 to 13, and adding a two-level enhancement for possession of more than 10 items. *Id.* amend. 436.

In 1995, Congress again directed the Commission to increase penalties for child pornography crimes by increasing the base offense levels by two levels and adding a two-level enhancement for use of a computer. *See* Sex Crimes Against Children Prevention Act of 1995, Pub. L. No. 104-71 §§ 2-3, 109 Stat. 774 (1995). Congress also directed the Commission to prepare a report and analysis of sex offenses against children and child pornography for submission to Congress. *Id.* § 6.

The Commission carried out Congress's directive by increasing the base offense levels from 15 to 17 for trafficking offenses and from 13 to 15 for possession, and by adding a two-level enhancement for use of a computer. *See* U.S.S.G. App. C., amend. 537 (Nov. 1, 1996).

In its report to Congress, the Commission explained that its analysis supported an enhancement for use of a computer to solicit participation in production of child pornography, but otherwise criticized the two-level computer enhancement because it failed to distinguish serious commercial distributors from more run-of-the-mill users. U.S. Sentencing Comm'n, *Sex Offenses Against Children: Findings and Recommendations Regarding Federal Penalties* 25-30, 37-38 (1996), http://ftp.ussc.gov/r_congress/SCAC.PDF. The Commission recommended that Congress increase statutory maximum sentences for production of child pornography and double the statutory maximum for offenders with prior convictions for sex abuse crimes. *Id.*, Executive Summary at ii. The Commission informed the Congress that it was considering consolidating § 2G2.4 and § 2G2.2, to remedy the disparity between receipt and possession offenses. *Id.* at 41.

Congress responded with legislation that directed the Commission to add enhancements for the use of a computer to per-

suade, induce, entice, coerce or facilitate the transport of a child; to increase penalties in any case in which the defendant engaged in a pattern of activity; and to clarify that distribution included distribution for nonpecuniary gain. *See* Protection of Children from Sexual Predators Act of 1998, Pub. L. No. 105-314 §§ 503, 505-507, 112 Stat. 2974 (1998).

In 2000, the Commission passed an amendment consistent with the 1998 Sexual Predators Act. The amendment revised the distribution enhancement in § 2G2.2 by detailing varying levels of enhancement, ranging from a general two-level enhancement to a seven-level enhancement for those who distributed child pornography to a minor to persuade him or her to engage in sexual conduct. *See* U.S.S.G. App. C, amend. 592 (Nov. 1, 2000); *Child Porn. History Rep't* at 35-36. Section 2G2.4 remained unchanged. *See id.*[1]

In 2003, Congress enacted the Prosecutorial Remedies and Other Tools to End the Exploitation of Children Today Act (the "PROTECT Act"), which established a five-year mandatory minimum sentence for trafficking/receipt offenses, increased the statutory maximum from 15 to 20 years for trafficking/receipt offenses, and increased the statutory maximum for possession offenses from five to ten years. *See* PROTECT Act, Pub. L. No. 108-21 § 103, 117 Stat. 650, 653 (2003). In the PROTECT Act, Congress—for the first time and the only time to date—made direct amendments to the Guidelines. *Child Porn. History Rep't* at 38. The Congress added to § 2G2.4 an enhancement of four levels for possession of images of sadistic or masochistic conduct. *See* PROTECT Act § 401(i); U.S.S.G. App. C, amend. 649 (April 30, 2003). It also amended both § 2G2.2 and § 2G2.4 by adding an enhancement varying between two and five levels based on the number of the child pornographic images. *Id.*

---

[1]The Commission responded to its concerns about patterns of activity enhancement and those in the Sexual Predators Act in 2001 by enacting a new guideline at § 4B1.5 (Repeat and Dangerous Sex Offender Against Minors). *See* U.S.S.G. App. C, amend. 615 (Nov. 1, 2001).

To conform to the new mandatory minimum sentences and higher statutory maxima introduced by the PROTECT Act, the Commission raised the base offense levels for trafficking/receipt offenses from 18 to 22 and the base offense levels for possession from 15 to 18. U.S.S.G. App. C, amend. 664 (Nov. 1, 2004); *Child Porn. History Rep't* at 46. The Commission also consolidated § 2G2.4 into § 2G2.2. *See* U.S.S.G. App. C, amend. 664. The Commission added a two-level decrease for offenders whose offenses were limited to receipt or solicitation of child pornography and who did not intend to distribute or traffic in such material.[2] *Id.*

**[3]** In sum, the child pornography Guidelines have been substantively revised nine times during their 23 years of existence. *Child Porn. History Rep't* at 54. Most of the revisions were Congressionally-mandated and not the result of an empirical study. As the Commission itself has explained, "The frequent mandatory minimum legislation and specific directives to the Commission to amend the [G]uidelines make it difficult to gauge the effectiveness of any particular policy change, or to disentangle the influences of the Commission from those of Congress." *Fifteen-Year Assessment* at 73. The Commission has also noted that "[s]entencing courts have . . . expressed comment on the perceived severity of the child pornography [G]uidelines through increased below-guidelines variance and downward departure rates." *Child Porn. History Rep't* at 54. The Commission therefore has established a review of the child pornography Guidelines as one of its priorities. *Id.*

---

[2]There have been no more amendments to § 2G2.2 relevant to the issue under consideration here. The Guideline, however, now covers a newly-created offense making it unlawful to produce or distribute "morphed images" of an identifiable minor. *See* PROTECT Act § 304; *Child Porn. History Rep't* at 50.

### III.  *Kimbrough* Sentencing Discretion in Child Pornography Cases

**[4]** During oral argument, the government recognized that district courts have authority to disagree with the child pornography Guidelines. As the history and the Commission's own reports and assessments of these Guidelines demonstrate, the child pornography Guidelines are, to a large extent, not the result of the Commission's "exercise of its characteristic institutional role," which requires that it base its determinations on "empirical data and national experience," but of frequent mandatory minimum legislation and specific congressional directives to the Commission to amend the Guidelines.[3] *Kimbrough*, 552 U.S. at 109. We therefore hold that, similar to the crack cocaine Guidelines, district courts may vary from the child pornography Guidelines, § 2G2.2, based on policy disagreement with them, and not simply based on an individualized determination that they yield an excessive sentence in a particular case.[4] *See Spears*, 129 S. Ct. at 843;

---

[3]That Congress has the authority to issue sentencing directives to the Commission is established beyond peradventure. *See United States v. LaBonte*, 520 U.S. 751, 757 (1997) ("Congress has delegated to the Commission significant discretion in formulating guidelines for sentencing convicted federal offenders. . . . Broad as that discretion may be, however, it must bow to the specific directives of Congress.") (internal quotations omitted). *See also* 28 U.S.C. § 994(a) (Commission must promulgate Guidelines that are "consistent with all pertinent provisions of any Federal statute. . . ."). As *Kimbrough* makes clear, however, the fact that the Guidelines conform to Congressional directives does not insulate them from a *Kimbrough* challenge.

[4]In so holding, we join several of our sister circuits. *See United States v. Dorvee*, 616 F.3d 174, 184-86 (2d Cir. 2010) (holding that § 2G2.2 is "fundamentally different" from other Guidelines and, unless it is "applied with great care, can lead to unreasonable sentences that are inconsistent with what § 3553 requires"); *United States v. Grober*, 624 F.3d 592, 608-09 (3d Cir. 2010) (§ 2G2.2 was not developed pursuant to the Commission's characteristic institutional role and district courts may, but are not obligated to vary on policy basis from it); *United States v. Stone*, 575 F.3d 83, 90 (1st Cir. 2009) (accepting defendant's argument that the child pornography Guidelines are based on congressional directives, and not on the Commission's empirical approach; district courts may therefore disagree

*Kimbrough*, 552 U.S. at 109-10.[5]

[5] We emphasize that we do not hold that application of
§ 2G2.2 will always result in an unreasonable sentence and

---

with the Guidelines). *See also United States v. Pape*, 601 F.3d 743, 749
(7th Cir. 2010) (district courts "are at liberty to reject *any* Guideline on
policy grounds—though they must act reasonably when using that
power.") (internal quotations omitted). *But see United States v. Pugh*, 515
F.3d 1179, 1201 n.15 (11th Cir. 2008) (child pornography Guidelines "do
not exhibit the deficiencies the Supreme Court identified in *Kimbrough*").

[5]Our holding that *Kimbrough* allows district courts to vary from the
Guidelines based on disagreements with Congressional policies expressed
in directives to the Commission is also consistent with this court's juris-
prudence, *see Mitchell*, 624 F.3d at 1028-30 (holding that, under *Kim-
brough*, courts may reject the career offender Guidelines, § 4B1.1, based
on policy disagreement with them), and that of several of our circuits. *See
Stone*, 575 F.3d at 89 (*Kimbrough* supplies district courts with authority
to vary from the Guidelines on a policy basis even where a Guidelines
provision is a direct reflection of a Congressional directive); *Grober*, 624
F.3d at 608 (same); *United States v. Corner*, 598 F.3d 411, 415-16 (7th
Cir. 2010) (en banc) (same).

We note that *Mitchell* and, by extension, our holding today are not
inconsistent with *United States v. Gonzalez-Zotelo*, 556 F.3d 736 (9th Cir.
2009). *Gonzalez-Zotelo* held that a district judge may not justify a down-
ward departure from the Guideline range as an "unwarranted disparity"
within the meaning of 18 U.S.C. § 3553(a)(6), where the disparity was the
result of a Congressionally-authorized sentencing policy. We had
explained in an earlier case, *United States v. Marcial-Santiago*, 447 F.3d
715 (9th Cir. 2006), that such disparities could not be unwarranted
because Congress had, by statute, required the Commission to promulgate
a Guideline providing for a downward departure for defendants in the fast-
track program and so had concluded that resulting disparities were not
unwarranted within the meaning of § 3553(a)(6). *See id.* at 717-19.
*Gonzalez-Zotelo* held only that *Kimbrough* was not inconsistent with
*Marcial-Santiago* and therefore *Marcial-Santiago* remained precedential
law. *See Gonzalez-Zotelo*, 556 F.3d at 379-41. *Mitchell*, by contrast, held
that *Kimbrough* authorized departures from the Guidelines based not on
perceived unwarranted disparities within the meaning of § 3553(a)(6) with
Guidelines applied in *other* cases, but based on policy disagreements with
the Guidelines used to calculate the sentence of the defendant before the
court. *See Mitchell*, 624 F.3d at 1027-29.

that sentencing courts must continue to consider the applicable Guidelines range as "the starting point and the initial benchmark," *Gall*, 552 U.S. at 49. *See Kimbrough*, 552 U.S. at 110 (noting that despite its policy disagreement with the crack cocaine Guidelines, the district court "began by properly calculating and considering the advisory Guidelines range."). Sentencing courts must also continue to consider all of the § 3553(a) factors in deciding upon the sentence. *See id.* at 110-11 (describing approvingly the district court's discussion of the relevant § 3553(a) factors and stating that the "ultimate question" is whether the sentence was reasonable). Finally, sentencing courts must continue to adequately explain their choice of the sentence, including their policy disagreement with § 2G2.2, to allow for meaningful appellate review and to promote the perception of fair sentencing. *Gall*, 552 U.S. at 50.

**[6]** We further emphasize that district courts are not obligated to vary from the child pornography Guidelines on policy grounds if they do not have, in fact, a policy disagreement with them. *See Stone*, 575 F.3d at 93 ("the district court's broad discretion includes the power to agree with the [child pornography] [G]uidelines"); *Grober*, 624 F.3d at 609 ("if a district court does not in fact have a policy disagreement with § 2G2.2, it is not obligated to vary on this basis"); *Pape*, 601 F.3d at 749 (affirming sentence where district court understood its *Kimbrough* discretion, but declined to exercise it). This observation does not mean that a district court presented with a *Kimbrough* argument is free to ignore it. On the contrary, a district court commits procedural error when it fails to appreciate its *Kimbrough* discretion to vary from the child pornography Guidelines based on a categorical policy disagreement with them. *United States v. Tutty*, 612 F.3d 128, 131 (2d Cir. 2010); *United States v. Stone*, 575 F.3d 83, 89 (1st Cir. 2009). Only when we are satisfied that the district court appreciated its *Kimbrough* discretion will we consider the substantive reasonableness of the sentence imposed.

## CONCLUSION

**[7]** The district judge in Henderson's case was squarely presented with the question of whether *Kimbrough* discretion applies. His ruling on the issue, however, is unclear. While he stated that he needed guidance from this court and suggested that Henderson raise the argument in his appeal, he also indicated that he was not accepting the argument that he must exercise *Kimbrough* discretion. Thus, we are unable to ascertain whether the district court committed procedural error by failing to appreciate its *Kimbrough* discretion to vary from the child pornography Guidelines, § 2G2.2, on policy grounds, or whether it recognized, but declined to exercise that discretion. We therefore remand to the district court to resentence exercising its *Kimbrough* discretion.

    REVERSED and REMANDED.

BERZON, Circuit Judge, *concurring*:

    I fully concur in Judge Fletcher's opinion for the court. I write only to emphasize that unjust and sometimes bizarre results will follow if § 2G2.2 is applied by district courts without a special awareness of the Guideline's anomalous history, chronicled in the court's opinion and elsewhere. *See* Troy Stabenow, *Deconstructing the Myth of Careful Study: A Primer on the Flawed Progression of the Child Pornography Guidelines*, Jan. 1 2009 (unpublished comment).[1] I briefly draw attention to two of the odd features of § 2G2.2, both of which were discussed at greater length in the Second Circuit's opinion in *United States v. Dorvee*, 616 F.3d 174 (2d Cir. 2010). *See id.* at 186-88.

---

[1]Available at http://www.fd.org/pdf_lib/child%20porn%20july%20 revision.pdf (last visited Apr. 19, 2011).

First, an unduly deferential application of § 2G2.2 will lead to the vast majority of offenders being sentenced to near the maximum statutory term. Because of the history of Congressional involvement, the base offense level for possession of child pornography is already a relatively high 18 (compared to 10 for the same offense in 1991). Enhancements for the use of a computer, depictions of prepubescent minors, portrayal of sadistic or masochistic conduct and the involvement of over 600 images—all of which apply in a majority of cases and some of which apply in more than 90% of them—add up to create an effective base offense level of 31. *See* United States Sentencing Commission, *Use of Guidelines and Specific Offense Characteristics Fiscal Year 2009*.[2] As a result, absent a reduction for acceptance of responsibility, an ordinary first-time offender could easily face a guideline range of 108 to 135 months—in other words, a guideline range at, and extending beyond, the extreme upper edge of the statutory range. (The statutory maximum is ten years, with no mandatory minimum. *See* 18 U.S.C. § 2252(b)(2)). *Cf. Dorvee*, 616 F.3d at 186-87. Such a concentration of nearly all offenders near the statutory maximum stands in significant tension with a sentencing judge's duties "to consider every convicted person as an individual," *Gall v. United States*, 552 U.S. 38, 52 (2007) (quotation omitted), and to impose a sentence no "greater than necessary" to achieve § 3553(a)'s objectives. *See* 18 U.S.C. § 3553(a); *see also Gall*, 552 U.S. at 55 (noting "the need to avoid unwarranted similarities among [defendants] who were not similarly situated").

Second, as the Second Circuit explained, § 2G2.2 often recommends longer sentences for those who receive or distribute images of minors than the applicable Guidelines recommend for those who actually engage in sexual conduct with minors. *See Dorvee*, 616 F.3d at 187. Such a result is particularly illogical, given that one of the frequently advanced justifica-

---

[2]Available at http://ftp.ussc.gov/gl_freq/09_glinexgline.pdf (last visited Apr. 19, 2011).

tions for harshly penalizing those who distribute or possess child pornography is the concern that such individuals could, if not restrained and deterred, later sexually abuse children— one would think, a much more serious offense. *See, e.g.*, 149 Cong. Rec. S5114 (daily ed. Apr. 10, 2003) (statement of Sen. Orrin Hatch) ("Congress has long recognized that child pornography produces three distinct, disturbing, and lasting harms to our children. First, child pornography whets the appetites of pedophiles and prompts them to act out their perverse sexual fantasies on real children. Second, it is a tool used by pedophiles to break down the inhibitions of children. Third, child pornography creates an immeasurable and indelible harm on the children who are abused to manufacture it.").

For better or worse, we must live with § 2G2.2: it is on the books and so must be the " 'starting point and initial benchmark' " for district judges sentencing those convicted of child pornography offenses. *Kimbrough v. United States*, 552 U.S. 85, 108 (2007) (quoting *Gall*, 552 U.S. at 49). But, like any Guideline, § 2G2.2 is merely advisory. District judges who, after having considered § 2G2.2, conclude that it constitutes bad advice should be encouraged to reject it as such. *See Kimbrough*, 552 U.S. at 113 (Scalia J., concurring) (emphasizing that "the district court is free to make its own reasonable application of the § 3553(a) factors, and to reject (after due consideration) the advice of the Guidelines").

---

CALLAHAN, Circuit Judge, concurring in the result:

I agree with my colleagues that because the district judge's ruling on the extent to which he could exercise his discretion in departing from the Guidelines for child pornography was not clear, a remand is appropriate. I write separately because I disagree with the majority's suggestion that the district court is free to disagree with the Guidelines for child pornography on policy grounds without explaining its disagreement. I dis-

agree because I do not find that the Guidelines for child pornography are similar to the crack cocaine Guideline considered by the Supreme Court in *Kimbrough v. United States*, 552 U.S. 85 (2007) and *Spears v. United States*, 555 U.S. 261 (2009).

As noted by the majority, the Supreme Court in *United States v. LaBonte*, 520 U.S. 751, 757 (1997), recognized that the ultimate authority for establishing sentences and guidelines rests with Congress and even when Congress delegates its authority to the Sentencing Commission, that discretion "must bow to the specific directives of Congress." As a general principle, a district court is not free to disregard a sentence or Guideline, established by Congress either directly or through the Commission solely because the court disagrees with the sentence or Guideline. Rather, as the Supreme Court has made clear, a sentencing court in determining the appropriate sentence may consider a Guideline's nature and lineage, but must set forth its reasons for the imposition of the sentence in the individual case.[1] Without such an explanation, neither we nor the public will be able to determine whether the sentence was constitutionally reasonable.

The Supreme Court has allowed something of an exception to this general approach for the Guideline for crack cocaine. *See Kimbrough v. United States*, 552 U.S. 85 (2007) and *Spears v. United States*, 555 U.S. 261 (2009). However, Guideline § 2G2.2 for possession of child pornography is not sufficiently similar to the crack cocaine Guideline, in its nature or lineage, to fit comfortably within this exception. The

---

[1] In *Gall v. United States*, 522 U.S. 38, 46 (2007), the Supreme Court stated that following *United States v. Booker*, 543 U.S. 220, 260-62 (2005), "the Guidelines are now advisory, and appellate review of sentencing decisions is limited to determining whether they are 'reasonable.'" The Court further stated that "a district judge must give serious consideration to the extent of any departure from the Guidelines and must explain his conclusion that an unusually lenient or an unusually harsh sentence is appropriate in a particular case with sufficient justifications." *Id.*

crack cocaine Guideline "employed a 100-to-1 ratio that yields sentences for crack offenses three to six times longer than those offenses involving equal amounts of [cocaine] powder." *Kimbrough*, 552 U.S. at 86. Moreover, the Commission over a number of years consistently opposed the use of this ratio. *Id*.

In contrast, the Guidelines for convictions for possessing child pornography are considerably more nuanced than the 100-to-1 ratio for crack cocaine.[2] Furthermore, as may be gleaned from the majority's opinion, the Commission has for

---

[2] United States Sentencing Guideline § 2G2.2 provided:

Trafficking in Material Involving the Sexual Exploitation of a Minor; Receiving, Transporting, Shipping, Soliciting, or Advertising Material Involving the Sexual Exploitation of a Minor; Possessing Material Involving the Sexual Exploitation of a Minor with Intent to Traffic; Possessing Material Involving the Sexual Exploitation of a Minor

(a) Base Offense Level:

(1) 18, if the defendant is convicted of 18 U.S.C. § 1466A(b), § 2252(a)(4), § 2252A(a)(5), or § 2252A(a)(7).

(2) 22, otherwise.

(b) Specific Offense Characteristics

(1) If (A) subsection (a)(2) applies; (B) the defendant's conduct was limited to the receipt or solicitation of material involving the sexual exploitation of a minor; and (C) the defendant did not intend to traffic in, or distribute, such material, decrease by 2 levels.

(2) If the material involved a prepubescent minor or a minor who had not attained the age of 12 years, increase by 2 levels.

(3) (Apply the greatest) If the offense involved:

(A) Distribution for pecuniary gain, increase by the number of levels from the table in § 2B1.1 (Theft, Property Destruction, and Fraud) corresponding to the retail value of the material, but by not less than 5 levels.

(B) Distribution for the receipt, or expectation of receipt, of a thing of value, but not for pecuniary gain, increase by 5 levels.

the most part agreed with, or at least gone along with, Congress's decisions to increase the sentences for possession of child pornography.

(C) Distribution to a minor, increase by 5 levels.

(D) Distribution to a minor that was intended to persuade, induce, entice, or coerce the minor to engage in any illegal activity, other than illegal activity covered under subdivision (E), increase by 6 levels.

(E) Distribution to a minor that was intended to persuade, induce, entice, coerce, or facilitate the travel of, the minor to engage in prohibited sexual conduct, increase by 7 levels.

(F) Distribution other than distribution described in subdivisions (A) through (E), increase by 2 levels.

(4) If the offense involved material that portrays sadistic or masochistic conduct or other depictions of violence, increase by 4 levels.

(5) If the defendant engaged in a pattern of activity involving the sexual abuse or exploitation of a minor, increase by 5 levels.

(6) If the offense involved the use of a computer or an interactive computer service for the possession, transmission, receipt, or distribution of the material, or for accessing with intent to view the material, increase by 2 levels.

(7) If the offense involved—

(A) at least 10 images, but fewer than 150, increase by 2 levels;

(B) at least 150 images, but fewer than 300, increase by 3 levels;

(C) at least 300 images, but fewer than 600, increase by 4 levels; and

(D) 600 or more images, increase by 5 levels.

(c) Cross Reference

(1) If the offense involved causing, transporting, permitting, or offering or seeking by notice or advertisement, a minor to engage in sexually explicit conduct for the purpose of producing a visual depiction of such conduct or for the purpose of transmitting a live visual depiction of such conduct, apply § 2G2.1 (Sexually Exploiting a Minor by Production of Sexually Explicit Visual or Printed Material; Custodian Permitting Minor to Engage in Sexually Explicit Conduct; Advertisement for Minors to Engage in Production), if the resulting offense level is greater than that determined above.

It follows that a sentencing court may not simply state that it disagrees with the child pornography Guidelines on policy grounds. At a minimum, some further explanation is necessary. The sentencing court should indicate, for example, whether it disagrees with "the two-level computer enhancement," "the seven-level enhancement for those who distribute child pornography to a minor to persuade him or her to engage in sexual conduct," "an enhancement of four levels for possession of images of sadistic or masochistic conduct," or "an enhancement varying between two and five levels based on the number of child pornographic images." *See* majority opinion pp.5609-11. Although the Commission may have expressed some concern with the first of these enhancements, it is not clear that it has any concerns with any of the other enhancements.

This is not to suggest that the sentencing court may not disagree with a particular aspect of a sentencing Guideline on policy grounds. The Supreme Court has recently explained:

> To be sure, we have recognized that the Commission post-*Booker* continues to "fil[l] an important institutional role" because "[i]t has the capacity courts lack to base its determinations on empirical data and national experience, guided by a professional staff with appropriate expertise." *Kimbrough*, 552 U.S. at 109, . . . (internal quotation marks omitted). Accordingly, we have instructed that district courts must still give "respectful consideration" to the now-advisory Guidelines (and their accompanying policy statements). *Id.* at 101, . . . . As *amicus* acknowledges, however, our post-*Booker* decisions make clear that a district court may in appropriate cases impose a non-Guidelines sentence based on a disagreement with the Commission's views. See *id.* at 109-110, . . . . That is particularly true where, as here, the Commission's views rest on wholly uncon-

vincing policy rationales not reflected in the sentencing statutes Congress enacted.

*Pepper v. United States*, 131 S. Ct. 1229, 1247 (2011) (parallel citations omitted).

However, the implicit limitations in this statement are made clear by Justice Breyer when he emphasizes in his concurring opinion in *Pepper*:

> **the law permits the court to disregard the Guidelines only where it is "reasonable" for a court to do so.** *Booker*, *supra*, at 261-262, . . . ; *Gall v. United States*, 552 U.S. 38, 51-52, . . . (2007); *Kimbrough v. United States*, 552 U.S. 85, 109, . . . (2007). And an appellate court must be guided by the basic sentencing objectives of the statutes that create the Guidelines in determining whether, in disregarding the Guidelines, the sentencing court has acted unreasonably.

131 S. Ct. at 1252 (emphasis added) (parallel citations omitted). A sentencing court may "impose a non-Guidelines sentence based on a disagreement with the Commission's views" only "in appropriate cases" where "the Commission's views rest on wholly unconvincing policy rationales not reflected in the sentencing statutes Congress enacted."

These statements inform our understanding of the Supreme Court's explanation in *Spears*, that *Kimbrough* authorized a sentencing court "to vary from the crack cocaine Guidelines based on *policy* disagreement with them, and not simply based on an individualized determination that they yield an excessive sentence in a particular case." 555 U.S. at __, 129 S. Ct. at 843 (italics in original). The Supreme Court appears to be stating that a court need not link its policy disagreement with the 100-to-1 ratio to the individual characteristics of the particular defendant. However, the Court did not state that the

district court does not have to set forth its policy disagreement. Without such a statement how can an appellate court determine, even under the deferential standard of review, whether the sentence is reasonable? An explanation of the policy disagreement is particularly important when the sentencing court disagrees with a Commission Guideline other than the 100-to-1 ratio, as the court may "disregard the Guidelines only where it is 'reasonable' for a court to do so." *Pepper*, 131 S.Ct. at 1252 (Justice Breyer concurring).

Unlike the simple 100-to-1 ratio at issue in *Kimbrough*, the Guidelines for convictions for possession of child pornography contain a mixture of provisions based on legislation and Commission action, some of which the Commission has questioned and others which the Commission has endorsed or acceded to, but none of which have been held by the Supreme Court to be "wholly unconvincing policy rationales not reflected in the sentencing statutes Congress enacted." *Id.* at 1247. Without a statement of the sentencing court's reasons for its imposition of a sentence that does not follow the applicable Guidelines, we cannot determine whether the sentence is reasonable.

I would adopt a procedure along the lines set forth by the Third Circuit in *United States v. Grober*, 624 F.3d 592, 600 (3rd Cir. 2010):

> the Guidelines reflect the Sentencing Commission's "rough approximation of sentences that might achieve § 3553(a)'s objectives." [*Rita v. United States*, 551 U.S. 348] at 350 [(2007)] . . . . If a district court concludes that those objectives are not achieved by a sentence within the . . . Guideline range, and that belief is driven by a policy disagreement with the [particular Guidelines] provision, then the court must explain why its policy judgment would serve the § 3553(a) sentencing goals better than the Sentencing Commission's judgments. In

doing so, he should take into account all of the sentencing factors, not just one or two of them in isolation. We require this explanation so that, on appeal, we can determine whether the court's disagreement is valid in terms of the § 3553 factors, the Sentencing Guidelines, and the perception of fair sentencing.

*Id*.

Accordingly, while I agree that the matter should be remanded to the district court for resentencing, I cannot agree that the majority's suggestion that the Guidelines for possession of child pornography inherently come within the "*Kimbrough* discretion."