# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 09-2532

_____

| | |
|---|---|
| United States of America, | * |
| | * |
| Appellee, | * |
| | *  Appeal from the United States |
| v. | *  District Court for the Eastern |
| | *  District of Missouri |
| Weldon Bryant, | * |
| | * |
| Appellant. | * |

_____

Submitted: February 12, 2010
Filed: June 4, 2010

_____

Before RILEY, Chief Judge,[1] SMITH and SHEPHERD, Circuit Judges.

_____

SHEPHERD, Circuit Judge.

Following a jury trial, Weldon Bryant was convicted of three counts of mail fraud, in violation of 18 U.S.C. § 1341.  The district court[2] sentenced Weldon to 18 months imprisonment to run consecutive to his three-year state sentence for

_____

[1]The Honorable William Jay Riley became Chief Judge of the United States Court of Appeals for the Eighth Circuit on April 1, 2010.

[2]The Honorable Stephen N. Limbaugh, Jr., United States District Judge for the Eastern District of Missouri.

possession of a controlled substance,[3] and ordered him to make restitution in the amount of $29,444. Weldon appeals his convictions, sentence, and the restitution order. We affirm.

## I.

In 2000, Eleanor J. Bryant, a retired school teacher residing in Fairdealing, Missouri, applied for a long-term care insurance policy ("the policy") through American Republic Insurance Company ("American Republic"). Once Ms. Bryant's application was accepted, American Republic's subsidiary, John Hancock Life Insurance Company ("John Hancock"), issued and administered the policy. The policy offered reimbursement of up to $70.00 per day[4] for the neccesary care expenses associated with long-term disability, including home health care.[5] To file a reimbursement claim under the policy, the insured (or their representative) had to submit a Custodial Nursing Care Questionnaire ("CNCQ") form to John Hancock. The CNCQ form required the claimant to provide a detailed description of the number of hours that a caregiver[6] had provided the insured, the dates of the service, and the

_____

[3]In 2004, Weldon was convicted in Missouri for possession of a controlled substance. Weldon received a suspended imposition of sentence of five years probation. His probation was revoked when he committed the instant offense, and Weldon was sentenced to three-years imprisonment.

[4]The maximum lifetime benefit under the policy was $153,000.

[5]Specifically, the policy stated, "We will pay the *actual charges incurred* for a provider of Home Health Care up to the Home Health Care Daily benefits as shown in the Policy Schedule. Any unused portion of your Daily Benefit will remain in the Policy Limit." (Appellee's App. 16 (emphasis added).)

[6]The policy only provided reimbursement of payment to in-home caregivers who qualified, under its terms, as "Home Health Care Providers." (See Appellee's App. 14.) Some of the qualified providers listed in the policy included: licenced agencies, licensed nurses, and certified nurse's aides. (Id.)

amount of money that the insured had paid the caregiver for service. The form was to be signed by both the caregiver and the insured, or the insured's representative. Once a claim was approved, John Hancock would then reimburse the insured for all expenses paid to the caregiver up to the $70.00 daily limit.

In January 2005, after Ms. Bryant was diagnosed with Alzheimer's disease, John Hancock determined that Ms. Bryant was eligible for benefits under the policy. Weldon, one of Ms. Bryant's sons, obtained a Power of Attorney, authorizing him to make health care decisions for his mother. Weldon then moved into Ms. Bryant's home and hired Jesse White, a Certified Nurse's Assistant, to provide home health care for his mother. Weldon began submitting CNCQ forms to John Hancock through the United States mail. All of the forms were signed by White and included information about the care White provided for Ms. Bryant. John Hancock reimbursed Weldon for the expenses he claimed on the forms.

On October 1, 2005, White stopped providing home health care services for Ms. Bryant. On two separate occasions subsequent to this date, Weldon arranged meetings with White. At these meetings, Weldon informed White that he had misplaced some of the CNCQ forms White had signed when providing home health care services to Ms. Bryant. Weldon indicated that he had not yet been reimbursed for these prior expenses and convinced White to sign approximately 20 blank CNCQ forms as substitutes for the alleged misplaced forms. Weldon then completed the blank, signed forms with fraudulent information regarding Ms. Bryant's care, claiming that White had provided skilled nursing care to Ms. Bryant, although in reality, White was no longer Ms. Bryant's caregiver. Weldon mailed the fraudulent CNCQ reimbursement forms to John Hancock on several occasions from November 2005 until January 2007.

After Ms. Bryant stopped receiving care from White in Fairdealing, she moved in with another son, Fred Bryant, in Fenton, Missouri. Fred employed Bon Vivant,

a care facility, to assist Ms. Bryant. Fred began sending reimbursement requests to John Hancock for Bon Vivant's care of his mother. At the same time, Weldon was submitting CNCQ forms which falsely represented that Ms. Bryant was still receiving care from White.

John Hancock's investigation into the matter revealed that Weldon had been submitting inaccurate claims for reimbursement. In September 2008, Weldon was indicted by a federal grand jury on four counts of mail fraud, in violation of 18 U.S.C. § 1341. Prior to trial, the government dismissed one of these counts. On February 13, 2009, a jury found Weldon guilty on the remaining three counts of mail fraud.

At the conclusion of Weldon's sentencing hearing, the district court determined Weldon's base offense level to be seven under United States Sentencing Commission, Guidelines Manual, §2B1.1(a). The court then applied a four-level enhancement for causing a loss in excess of $10,000, under USSG §2B1.1(b)(1)(C). This resulted in an offense level of 11. With a criminal history category of III based on his 2004 Missouri drug conviction, Weldon's advisory Sentencing Guidelines range was 12 to 18 months imprisonment. In denying Weldon's request for a downward departure, the district court stated, "I don't believe there's any proper grounds for downward departure because the criminal history category does not substantially over represent the seriousness of your situation and your criminal history." (Sent. Tr. 27.) Further, the district court explained:

> There's no question in my mind that you can be a useful and productive citizen and you will on your release, but I have to say I was shocked when I found out that you had a conviction for cocaine on your record in 2004. That was the first I'd heard about it and I could hardly believe it because a person of your standing in the community, with all the advantages that you have - - My goodness, your mother was a school teacher for all of your life. Only blessing in this whole tragedy is that she's suffering from dementia and probably doesn't know about your situation now . . . . 90 percent of the people that we see in this courtroom

-4-

haven't had a fraction of the advantages that you've had. I mean you're a very intelligent person with a college degree and successful life most of all and here you get a drug violation and while you're on probation, you commit fraud to the tune of some $29,000 against an insurance company and regardless of your motives on that, I mean this is just simply inexcusable. Pursuant to the Sentencing Reform Act of 1984 and the provisions of Title 18, United States Code, Section 3553(a) and also pursuant to the sentencing objectives of just punishment, general deterrence and incapacitation, it is the judgment and sentence of the Court that you are hereby committed to the custody of the Bureau of Prisons to be imprisoned for a term of 18 months.

(Id. at 26-27.) Further, "pursuant to the provisions of [USSG] section 5G1.3," the district court ordered that Weldon's sentence run consecutively to his three-year sentence for his prior state court conviction. (Id. at 27.) In addition, the court ordered Weldon to pay restitution in the amount of $29,444 to John Hancock, the amount of loss to John Hancock proven by the government at trial.

## II.

Weldon appeals, challenging (1) the sufficiency of the evidence supporting his mail fraud convictions, (2) his sentence, and (3) the district court's refusal to award a portion of the restitution amount to Ms. Bryant's estate.

## A.

"We review the sufficiency of the evidence de novo, viewing the evidence in the light most favorable to the government, resolving evidentiary conflicts in the government's favor, and drawing all reasonable inferences in favor of the jury's verdict." United States v. Stymeist, 513 F.3d 759, 764 (8th Cir. 2009), cert. denied,

No. 09-9420, 2010 WL 891331 (Apr. 5, 2010). To establish mail fraud,[7] the government must prove: "(1) a scheme to defraud by means of material false representations or promises, (2) intent to defraud, (3) reasonable foreseeability that the mail would be used, and (4) [that] the mail was used in furtherance of some essential step in the scheme." United States v. Parker, 364 F.3d 934, 943 (8th Cir. 2004) (citing 18 U.S.C. § 1341); see also United States v. Frost, 321 F.3d 738, 740-41 (8th Cir. 2003) (affirming a mail fraud conviction where defendant mailed documents requesting payment with forged signatures in order to maintain the appearance that other parties had approved the payments).

Weldon disputes only the first element, arguing that the reimbursed insurance funds he received from John Hancock "were legitimately obtained for the purposes sought," including payment for his own care of Ms. Bryant. (Appellant's Br. 14.) He claims that his false representations about White's care of Ms. Bryant were not materially false representations under Ms. Bryant's policy because "for purposes of a criminal fraud under the mail fraud statute, the government must prove more than a deceit perpetrated on the insurance company with respect to the identity of the care-giver." (Id. at 11.) Weldon further argues that material terms of the policy—that Ms. Bryant was ill, qualified for benefits under the policy, and was provided care by

_____

[7]A person can be convicted of mail fraud when the person:

> having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises . . . for the purpose of executing such scheme or artifice or attempting so to do, places in any post office or authorized depository for mail matter, any matter or thing whatever to be sent or delivered by the Postal Service . . . or takes or receives therefrom, any such matter or thing, or knowingly causes to be delivered by mail . . . any such matter or thing . . . .

18 U.S.C. § 1341.

Weldon—were not misrepresented by him, and because the identity of the caregiver was not specifically listed as a material term of the contract, John Hancock was not defrauded out of a property right by a *material* representation when Weldon represented that White was caring for Ms. Bryant.

Weldon is correct that to constitute mail fraud, a defendant's misrepresentations must be material. See Neder v. United States, 527 U.S. 1, 23-25 (1999); see also United States v. Heppner, 519 F.3d 744, 748-49 (8th Cir.) ("In order to be convicted of mail fraud, a defendant must have made a material falsehood; materiality is an essential element of the offense."), cert. denied, Anderson v. United States, 129 S. Ct. 250 (2008). However, contrary to Weldon's argument, there is no requirement that a term be specifically designated as "material" in an insurance policy for the term to actually be material for purposes of mail fraud. Instead, "[a] misrepresentation is material if it is capable of influencing the intended victim." United States v. Hively, 437 F.3d 752, 764 (8th Cir. 2006) (citing Neder, 527 U.S. at 24); see also Preston v. United States, 312 F.3d 959, 961 (8th Cir. 2002) (per curiam) (a material fact is "a fact that would be important to a reasonable person in deciding whether to engage or not to engage in a particular transaction").

The record reflects that from November 2005 through January 2007, Weldon mailed reimbursement forms to John Hancock, all of which alleged that Weldon had paid White for care which, in reality, was never provided to Ms. Bryant by White. It is irrelevant that Weldon himself cared for Ms. Bryant prior to her move to Fenton because he was not a licensed nurse, a certified nurse's aide, nor any other type of qualified home care provider specifically listed in John Hancock's policy. (See Appellee's App. 14.) John Hancock, influenced by Weldon's false claims of care, relied on Weldon's misrepresentations to send Weldon reimbursement checks for care John Hancock believed was being provided, although John Hancock was only obligated to reimburse the *actual charges* Ms. Bryant incurred for care provided by

qualifying providers. These misrepresentations thus "influenc[ed] the intended victim," Hively, 437 F.3d at 764, and were therefore material.

B.

Weldon next challenges his sentence, arguing that the district court: (1) inappropriately rejected Weldon's request for a downward departure based on his suggestion that his criminal history was overstated; (2) erred by inadequately explaining its reasoning at sentencing; (3) erred in its imposition of consecutive sentences; and (4) inappropriately weighed sentencing factors and considered prohibited factors at sentencing. We review a district court's sentence for abuse of discretion. Gall v. United States, 552 U.S. 38, 46 (2007). Under this standard, we initially review a sentence for significant procedural error and then, if necessary, for substantive reasonableness. United States v. Fischer, 551 F.3d 751, 754 (8th Cir. 2008).

1. Significant Procedural Error

In reviewing a sentence for significant procedural error, we review a district court's factual findings for clear error and its interpretation and application of the guidelines de novo. Id. Procedural errors include "failing to calculate (or improperly calculating) the Guidelines range, treating the Guidelines as mandatory, failing to consider the §3553(a) factors, selecting a sentence based on clearly erroneous facts, or failing to adequately explain the chosen sentence—including an explanation for any deviation from the Guidelines range." Gall, 552 U.S. at 51. "[W]hen a judge decides simply to apply the Guidelines to a particular case, doing so will not necessarily require lengthy explanation." Rita v. United States, 551 U.S. 338, 356 (2007).

Weldon argues that the district court erred in denying his request for a downward departure from the advisory Guidelines range based on his alleged

-8-

overstated criminal history. "If reliable information indicates that the defendant's criminal history category substantially over-represents the seriousness of the defendant's criminal history . . . a downward departure may be warranted." USSG §4A1.3(b)(1). However, in general, "[t]he discretionary denial of a motion for downward departure is unreviewable unless the court failed to recognize its authority to depart." United States v. Andreano, 417 F.3d 967, 970 (8th Cir. 2005); see also United States v. Vasquez, 433 F.3d 666, 670 (8th Cir. 2006) ("[W]e cannot review whether the district court erred in declining to exercise its discretion to depart downward for overstated criminal history."). Here, the district court recognized its authority to depart downward, yet decided not to do so, stating, "I don't believe there's any proper grounds for downward departure because the criminal history Category does not substantially over represent the seriousness of your situation and your criminal history." (Sent. Tr. 27.) Because the district court recognized its authority, we are precluded from reviewing this decision.

Weldon also argues that the district court committed significant procedural error by not adequately considering the section 3553(a) sentencing factors. Contrary to Weldon's contention, however, there is no requirement that the district court recite every section 3553(a) factor, United States v. Battiest, 553 F.3d 1132, 1136 (8th Cir.), cert. denied, 129 S. Ct. 2452 (2009), and the defendant's PSR, arguments by the parties, and other evidence at the sentencing hearing all provide the court with enough information on which to base a sentencing decision. See United States v. Struzik, 572 F.3d 484, 487 (8th Cir. 2009).

In Struzik, we concluded that the district court "fully considered [the section 3553(a)] factors and sufficiently explained its decision" where "the court had 'significant exposure' to [the defendant's] PSR, the parties' sentencing memoranda and their arguments at the sentencing hearing" and "imposed a sentence which he justified by specific reference to several § 3553(a) factors." Id. Similarly here, the district court heard arguments by both parties, and Weldon's PSR explained his

offense level and recommended sentence. <u>See</u> <u>United States v. Jones</u>, 493 F.3d 938, 941 (8th Cir. 2007) ("The [PSR] contains extensive information regarding [the defendant], his history and characteristics, the nature and circumstances of the offense, the kinds of sentences available, and a recommended advisory sentencing guidelines range, all of which are factors under § 3553(a)."), <u>vacated,</u> 552 U.S. 1091 (2008), <u>reinstated,</u> 275 F. App'x 561, 562 (8th Cir. 2008) (unpublished per curiam). Although the district court did not recite every section 3553(a) factor, the court did refer to section 3553(a) and specifically accounted for "the sentencing objectives of just punishment, general deterrence and incapacitation," (Sent. Tr. 27), all of which are considerations under section 3553(a), <u>see</u> 18 U.S.C. § 3553(a); <u>see also</u> <u>United States v. Gray</u>, 533 F.3d 942, 943 (8th Cir. 2008) ("If a district court references some of the considerations contained in § 3553(a), we are ordinarily satisfied that the district court was aware of the entire contents of the relevant statute." (quotation omitted)). We conclude that the district court adequately considered the section 3553(a) factors.

We are further unpersuaded by Weldon's argument that the district court erred in sentencing him to serve consecutive and not concurrent sentences. Weldon claims that the district court should have provided a separate statement of reasons for this sentencing decision. "We review a district court's decision to impose a consecutive or concurrent sentence for reasonableness." <u>United States v. McDonald</u>, 521 F.3d 975, 980 (8th Cir. 2008) (quotation omitted). A review for reasonableness is "akin" to the "abuse-of-discretion" standard. <u>United States v. Mathis</u>, 451 F.3d 939, 941 (8th Cir. 2006).

"Multiple terms of imprisonment imposed at different times run consecutively unless the court orders that the terms are to run concurrently." 18 U.S.C. § 3584. "To allow for meaningful appellate review, '[t]he district court must explain its reasoning for imposing a concurrent or consecutive sentence." <u>McDonald</u>, 521 F.3d at 980 (<u>quoting</u> <u>United States v. Winston</u>, 456 F.3d 861, 867 (8th Cir. 2006) (alterations in original)). Before imposing a consecutive sentence, the district court must consider

18 U.S.C. § 3584, which refers to the factors in 18 U.S.C. § 3553(a).  See United States v. Mayotte, 249 F.3d 797, 799 (8th Cir. 2001) (per curiam).  Recently, we held that a consecutive sentence was reasonable where:

> The court expressly referred to section 5G1.3(c) and the accompanying application note as well as the application note's comment that section 3584 and its reference to section 3553(a) be considered. The court discussed the section 3553(a) factors and their applicability including: the nature and circumstances of the offenses of conviction; the kinds of sentences available; [the defendant's] history and characteristics, noting his age, education, and his history of drug use; [the defendant's] criminal history [and] the need to protect the public . . . .

United States v. Tonks, 574 F.3d 628, 633 (8th Cir. 2009).  Although Weldon claims that "while the District Court did mention the § 3553(a) factors, it did not do so in connection with any discussion concerning concurrent versus consecutive sentences," (Appellant Br. 21), there is no requirement that a district court provide a separate statement of reasons because, unless it is a "doubtful case," a sentencing court need not specifically explain its reasoning in the imposition of a consecutive sentence, United States v. Lincoln, 956 F.2d 1465, 1474 n.9 (8th Cir. 1992).

> We note that the District Court did not explain its decision to make Lincoln's subornation of perjury sentence consecutive to his previously imposed arson and mail fraud sentences in terms of 18 U.S.C. § 3553(a) . . . . While in doubtful cases a sentencing court's failure to explain its decision might call its evaluation into question, our examination of the record reveals nothing . . . to indicate that the district court erred in imposing consecutive sentences or failed to consider the relevant factors set forth in [18 U.S.C. §] 3553(a).

Id. (quotation omitted).

We find nothing in the district court's sentence reflecting any failure to consider the § 3553(a) factors or failure to explain its decision.  In fact, the court explicitly

referenced the § 3553(a) factors and its authority to impose consecutive sentences, stating that the sentence was imposed "[p]ursuant to the Sentencing Reform Act . . . the provisions of Title 18 . . . Section 3553(a) and also pursuant to the sentencing objectives of just punishment, general deterrence and incapacitation," and "the provisions of Section 5G1.3." (Sent. Tr. 27.) The district court's reasoning was sufficient and the imposition of a consecutive sentence was therefore reasonable.

We conclude that the district court did not commit significant procedural error.

## 2. Substantive Error

"If the decision was 'procedurally sound,' we then review the 'substantive reasonableness of the sentence' . . . considering the totality of the circumstances." United States v. Shy, 538 F.3d 933, 937 (8th Cir. 2008) (quoting Gall, 552 U.S. at 51). "[I]n determining whether the district court considered the relevant factors in a particular case, 'the context for the appellate court's review is the entire sentencing record, not merely the district court's statements at the hearing.'" Gray, 533 F.3d at 944 (quoting United States v. Perkins, 526 F.3d 1107, 1111 (8th Cir. 2008)). Substantive reasonableness is presumed if a sentence is within the appropriately calculated Guidelines range. See United States v. Keating, 579 F.3d 891, 894 (8th Cir. 2009). However, an abuse of discretion occurs "where the sentencing court fails to consider a relevant factor that should have received significant weight, gives significant weight to an improper or irrelevant factor, or considers only the appropriate factors but commits a clear error of judgment in weighing those factors." United States v. Moore, 565 F.3d 435, 438 (8th Cir. 2009) (quotation omitted).

Weldon argues that the district court committed substantive error by failing to consider relevant sentencing factors, including: (1) the stress he was under while caring for his elderly mother; (2) the fact that he could satisfy the restitution award more quickly if he was working and not incarcerated; and (3) his age, health, and

-12-

family situation. However, the district court was provided this information at sentencing and we find that the district court did not commit a "clear error of judgment in weighing [the factors]." Id.; see also Rita, 551 U.S. at 359 ("Where a matter is as conceptually simple as in the case at hand and the record makes clear that the sentencing judge considered the evidence and arguments, we do not believe the law requires the judge to write more extensively.").

Further, Weldon challenges the district court's alleged reliance on his socio-economic status at sentencing. He argues that the district court erred by discussing his "advantages" in comparison to other defendants because the court was not permitted to consider Weldon's socio-economic status pursuant to USSG §5H1.10. His argument, however, is belied by the fact that the district court's sentence falls within the advisory Guidelines range and the limitations in USSG Chapter 5H[8] only apply when a district court departs from the Guidelines. See United States v. Robinson, 409 F.3d 979, 980 (8th Cir. 2005) ("Subchapter 5H of the Guidelines contains policy statements that 'address the relevance of certain offender characteristics to the determination of whether a sentence should be outside the

---

[8]The introduction to Chapter Five, Part H, of the Guidelines states:

*The Commission has determined that certain circumstances are not ordinarily relevant to the determination of whether a sentence should be outside the applicable guideline range. Unless expressly stated, this does not mean that the Commission views such circumstances as necessarily inappropriate to the determination of the sentence within the applicable guideline range or to the determination of various other incidents of an appropriate sentence.*

USSG Ch.5H, intro. comment. These circumstances include race, sex, national origin, creed, religion, and socio-economic status. See USSG § 5H1.10.

applicable guideline range.'" (quoting USSG Ch.5, Pt. H, intro. comment.)); see also United States v. Dyck, 334 F.3d 736, 743 (8th Cir. 2003) ("The district court's other asserted bases for departing downward [including those reasons listed in USSG § 5H1.10] do not support the departure.").

Additionally, there is no indication in the record that the district court even relied upon Weldon's socio-economic status during sentencing. The court did not discuss Weldon's income or race or that of the general population in which Weldon resided. In fact, all that the district court noted was that Weldon had "advantages" and a "successful" life. (Sent. Tr. 26-27.)

We conclude that the district court did not abuse its discretion in the imposition of Weldon's sentence.

## C.

Weldon next appeals the district court's award of restitution in the amount of $29,444 to John Hancock, arguing that a portion of the restitution should be paid to his mother's estate as she will now qualify for fewer benefits because of his fraud. "We review a restitution order for abuse of discretion and the district court's application of the restitution statute de novo." United States v. Reichow, 416 F.3d 802, 804 (8th Cir. 2005). The Mandatory Victims Restitution Act ("MVRA") mandates that a trial court order "that the defendant make restitution to the victim of the offense," 18 U.S.C. § 3663A(a)(1), when the defendant is convicted of "an offense against property under [Title 18] . . . including any offense committed by fraud or deceit," id. § 3663A(c)(1)(A)(ii). Under the MVRA, a "victim" is defined as "a person directly and proximately harmed as a result of the commission of an offense for which restitution may be ordered . . . ." Id. § 3663A(a)(2). This court has applied

the MVRA to mail fraud cases.  See United States v. Stennis-Williams, 557 F.3d 927, 930 (8th Cir. 2009).

Ms. Bryant's policy provided for reimbursement of caregiver services paid by Ms. Bryant (or Weldon, her agent).  Because Weldon did not actually pay for the services he represented that White had provided for his mother, Weldon was not legally entitled to any reimbursement from John Hancock.  However, because John Hancock reimbursed Weldon under these fraudulent claims, John Hancock was "directly and proximately harmed as a result of the commission of [Weldon's] offense," 18 U.S.C. § 3663A(a)(2), and John Hancock, not Ms. Bryant, is the victim and the proper recipient of the restitution award.  Furthermore, if the restitution was paid to Ms. Bryant's estate, Weldon could inappropriately benefit as a potential beneficiary of his mother's estate.  This would defeat the purpose of the MVRA, which is to restore the injured party, not to benefit the wrongdoer.  United States v. Balentine, 569 F.3d 801, 806 (8th Cir.) (the purpose of the MVRA "is to make victims of crime whole, to fully compensate these victims for their losses and to restore these victims to their original state of well-being." (quotation omitted) pet. for cert. filed (U.S. Sept. 28, 2009) (No. 09-6760)).  We, therefore, conclude that the district court did not abuse its discretion in awarding the full restitution amount to John Hancock.

III.

Accordingly, we affirm the judgment of the district court.

_____