*1041 BEAM, Circuit Judge,
dissenting.
Early in its lengthy sentencing colloquy the district court, quoting Judge Learned Hand, states, “ ‘[A] judge ... is charged to see that the law is properly administered and it is a duty which he cannot discharge by remaining inert.’ ” United States v. VandeBrake, 771 F.Supp.2d 961, 966 (N.D.Iowa 2011) (quoting United States v. Marzano, 149 F.2d 923, 925 (2d Cir.1945)). There is, though, something to be said for some measure of inertness in the course of a criminal sentencing procedure fueled at the outset by a judicial observation that the defendant suffered from “insatiable greed, which is all the more shocking because [the defendant was] already [a] wealthy, multi-millionaire businessm[a]n.” Id. at 965. Of course, even a multi-millionaire businessman has the right to be sentenced under the rule of law, especially rules recently put in place by the Supreme Court. Rich persons, poor persons and persons at all other economic strata should expect no less. Indeed, a United States Judge upon assuming office takes an oath that states, in part: “I will administer justice without respect to persons, and do equal right to the poor and to the rich.” 28 U.S.C. § 453. Make no mistake about it though, VandeBrake committed serious violations of federal law and deserves substantial penalties as a result, whatever the bestowal of economic largess upon him.
As noted by the court majority, VandeBrake was charged with three price fixing and bid rigging offenses in violation of 15 U.S.C. § 1. Ante at 1031. He entered guilty pleas to these antitrust crimes, which triggered the use of U.S.S.G. § 2R1.1, the antitrust guideline. At this point, however, the district court (sometimes sentencing court) concluded that this guideline was flawed because, in the court’s view, it is “overly lenient” with respect to all antitrust offenders, VandeBrake, 771 F.Supp.2d at 1003, and “fail[ed] to provide a just and reasoned sentencing range given the facts of [this] case.” Id. at 1004.
Apparently in an attempt to avoid a claim of procedural error,[8] the district court purported to calculate a guidelines sentencing range using § 2R1.1 but then set it aside in favor of an alternate calculation using U.S.S.G. § 2B1.1, the guideline for offenders convicted of fraud.[9] As a *1042 result of this switch, § 2B1.1, for all practical purposes, became the paradigm for the final formation of VandeBrake’s very substantial sentence. This failure to use the antitrust guideline for antitrust violations resulted in procedural error.
How could this guideline substitution have happened given Congress’s and the Sentencing Commission’s concerns about substantial uniformity in preliminary sentence calculations for identical criminal conduct — into which initial calculations judges would then insert variable, relevant circumstances and characteristics of individual offenders and, in this way, construct equitable and reasonable individualized penal judgments? It happened, apparently, because the sentencing court interpreted the Sentencing Commission’s antitrust guideline formulations as being inadequate for use in sentencing antitrust offenders in general,[10] see VandeBrake, 771 F.Supp.2d at 1003, and in particular, at least when a defendant, as the court measures it, is a rich and greedy businessman, see id. at 965.
Where does a sentencing court find such unfettered authority, especially when failure to employ a Commission-designated guideline at the outset will surely result in widely varying sentences for substantially similar wrongdoers? To this inquiry, the sentencing court and court majority reply: Kimbrough v. United States, 552 U.S. 85, 128 S.Ct. 558, 169 L.Ed.2d 481 (2007), Spears v. United States, 555 U.S. 261, 129 S.Ct. 840, 172 L.Ed.2d 596 (2009) (per curiam), and United States v. Feemster, 572 F.3d 455 (8th Cir.2009) (en banc).
But, no such authority can be gleaned from these cases.
The basic holding of Kimbrough (which dealt exclusively with the guidelines’ 100:1 powder/crack ratio) is that a district court has deferential discretionary authority to substantially vary from a correctly calcu *1043 lated guidelines range, based exclusively upon the court’s policy disagreement with a particular guideline, if the guideline at issue is not the product of the Commission’s institutional strengths.[11] 552 U.S. at 109, 128 S.Ct. 558. But, this is not true if the guideline at issue “exemplifies] the Commission’s exercise of its characteristic institutional role.” Id.; Spears, 555 U.S. at 264, 129 S.Ct. 840. The court majority’s error today is manifest in its failure to apply this limitation and its act of reviewing the district court’s extended and erroneous sentencing exercise using only a deferential abuse of discretion standard.
To support my contention, I briefly review the procedural requirements at work in this sentencing dispute. Even though, since United States v. Booker, 543 U.S. 220, 245, 125 S.Ct. 738, 160 L.Ed.2d 621 (2005), all sentencing guidelines are advisory in nature, they nonetheless continue to serve an important and mandatory function in the creation of a federal criminal sentence. Kimbrough, 552 U.S. at 108, 128 S.Ct. 558. Using the guideline or guidelines designated by the Sentencing Commission for use with the particular offense or offenses of conviction, the sentencing court is initially charged with calculating a guideline sentencing range for the defendant. In fact, it is a “significant procedural error” for the sentencing judge to fail to fulfill this “first” requirement. Gall v. United States, 552 U.S. 38, 51, 128 S.Ct. 586, 169 L.Ed.2d 445 (2007). And, we review a district court’s “interpretation and application of the guidelines de novo.” United States v. Bryant, 606 F.3d 912, 918 (8th Cir.2010).[12]
Accordingly, the district court’s interpretations of the intrinsic breadth or limitations of § 2R1.1, the court’s rejection, at least in part, of that guideline for use in the sentencing of VandeBrake, and the court’s alternative interpretation, application and use of § 2B1.1 in lieu of § 2R1.1 should all have been reviewed by this court de novo. Further, if the sentencing court’s numerous erroneous acts had been so reviewed, it is my belief that they would have been summarily rejected by this court.
Concluding, for purposes of further discussion only, that the sentence calculation in this case is procedurally sound and survives de novo review, the sentencing court’s bald assumption that it has deferential discretion to substantially vary from all guidelines on policy grounds is reversible error.
Under Kimbrough analysis, you must first determine whether the applicable guideline is the product of the Sentencing Commission’s inherent expertise. Kimbrough’s result only depicts judicial analysis of a guideline that was not the product of the Commission’s institutional strengths. The guideline at issue here, on the other hand, embodies the Commission’s expertise. Thus, Kimbrough does not support the notion that the sentencing court’s policy disagreement with § 2R1.1 is entitled to deferential abuse-of-discretion review.
*1044 Indeed, Kimbrough acknowledges that “closer review may be in order” if a sentencing judge varies from an applicable guideline that is the product of the Commission’s institutional strengths, based solely on the judge’s opinion, as here, that the guideline “fails properly to reflect § 3553(a) considerations even in a mine-run case.” 552 U.S. at 109, 128 S.Ct. 558 (internal quotation omitted); see also Spears, 555 U.S. at 264, 129 S.Ct. 840 (explaining that this brand of variance “may be entitled to less respect”). The sort of categorical policy-based variance applied by the sentencing court in this case stands in stark contrast to a district court’s variance based on the particular facts of an individual case, which is entitled to “greatest respect” because it exemplifies the district court’s institutional strengths. Kimbrough, 552 U.S. at 109, 128 S.Ct. 558; see Feemster, 572 F.3d at 464 (explaining that substantive appellate review in sentencing cases is “narrow and deferential,” but only when the district court’s justifications for the sentence are based on “defendant-specific” determinations). Therefore, to determine the deference to be given the district court’s variance here, we must begin with an analysis of whether or not § 2R1.1 (or for that matter § 2B1.1) is the product of the Commission’s expertise.
As a general matter, the Sentencing Commission employed an “empirical approach” to formulate its several guidelines. Kimbrough, 552 U.S. at 96, 128 S.Ct. 558. Under this approach, the Commission first conducted “an empirical examination of 10,000 presentence reports setting forth what judges had done in the past.” Rita v. United States, 551 U.S. 338, 349, 127 S.Ct. 2456, 168 L.Ed.2d 203 (2007). Then, the Commission “modifiied] and adjusted] past practice in the interests of greater rationality, avoiding inconsistency, complying with congressional instructions, and the like.” Id. Since the initial crafting of the guidelines, the Commission has been charged with “formulating] and constantly refin[ing] national sentencing standards.” Kimbrough, 552 U.S. at 108, 128 S.Ct. 558. The Commission’s institutional strength, then, is its ability to “base its determinations on empirical data and national experience, guided by a professional staff with appropriate expertise.” Id. at 109, 128 S.Ct. 558 (quotation omitted).
As stated above, Kimbrough provides an example of a guideline that was not a product of the Commission’s expertise. There, the Court found that the guidelines’ 100:1 powder/crack ratio was not based on the Commission’s empirical research; rather, the ratio was simply borrowed from the ratio Congress used to set minimum and maximum sentences in the Anti-Drug Abuse Act of 1986.[13] Id. at 95-96, 128 S.Ct. 558. And, in turn, the Act’s ratio was based on Congress’s mere assumptions regarding the relative dangerousness of crack. Id. at 95, 128 S.Ct. 558. After adopting the 100:1 ratio in the original guidelines, the Commission’s research revealed that many of the assumptions used to justify the 100:1 ratio were baseless. Id. at 97-98, 128 S.Ct. 558. The Commission therefore attempted to amend the guidelines to reduce the ratio to 1:1, but Congress blocked this attempt pursuant to 28 U.S.C. § 994(p), which provides that the Commission’s guideline amendments become effective unless disapproved by Congress. Id. at 99,128 S.Ct. 558. Given that the guidelines’ 100:1 ratio was (1) no longer supported by the Commission, and (2) contrary to the Commission’s research, the *1045 Court held that the ratio did not “exemplify the Commission’s exercise of its characteristic institutional role.” Id. at 109, 128 S.Ct. 558.
In contrast to the 100:1 ratio at issue in Kimbrough, the antitrust guideline at issue here, § 2R1.1, exemplifies the Commission’s institutional strengths. The legislative history of 28 U.S.C. § 994, which outlines the duties of the Commission, provides that, in crafting the guidelines,
the Commission might conclude that a category of major white collar criminals too frequently was sentenced to probation or too short a term of imprisonment because judges using the old rehabilitation theory of sentencing! ] did not believe such offenders needed to be rehabilitated and, therefore, saw no need for incarceration. The Commission might conclude that such a category of offenders should serve a term of imprisonment, or a longer term than currently served, for purposes of punishment and deterrence.
S.Rep. No. 98-225, at 177 (1983), reprinted in 1984 U.S.C.C.A.N. 3182, 3360. Following Congress’s cue, the Commission’s first version of the guidelines increased the mean sentences of white-collar crimes above then-current averages to reduce the disparity between white-collar crimes and other property crimes, such as larceny. U.S. Sentencing Comm’n, Supplementary Report on the Initial Sentencing Guidelines & Policy Statements 18 (1987).
As with other white-collar crimes, the Commission deliberately raised the sentences for antitrust violations above preguidelines averages. The background notes accompanying § 2R1.1 state that prison terms for antitrust offenses “should be much more common, and usually somewhat longer, than typical under pre-guidelines practice.” U.S.S.G. § 2R1.1 cmt. background (2010). Indeed, the original sentencing ranges in § 2R1.1 “represented] a substantial change from [then-present] practice. [Under pre-guidelines practice], approximately 39 percent of all individuals convicted of antitrust violations [were] imprisoned” and “the average time served ... was only forty-five days.” U.S.S.G. § 2R1.1 cmt. background (1987).
While the Commission increased offense levels for fraud based on “loss” in U.S.S.G. § 2B1.1, the Commission decided to use “volume of commerce” to gauge the scale and scope, of antitrust offenses under § 2R1.1. As the Commission explained,
The offense levels [in § 2R1.1] are not based directly on the damage caused or profit made by the defendant because damages are difficult and time consuming to establish. The volume of commerce is an acceptable and more readily measurable substitute. The limited empirical data [as to pre-guidelines practice] show that fines increase with the volume of commerce and the term of imprisonment probably does as well.
U.S.S.G. § 2R1.1 cmt. background (1987).
The first significant[14] amendment to § 2R1.1 came in 1991 when the Commission increased the guideline’s offense levels and added more steps to the volume of commerce table. U.S.S.G. app. C, amend. 377. The Commission increased the offense levels in § 2R1.1 “to make them more comparable to the offense levels for fraud with similar amounts of loss.” Id. The Commission also explained the differences between the antitrust and fraud guidelines as follows:
The base offense level for antitrust violations starts higher than the base offense level for fraud violations to reflect the serious nature of and the difficulty *1046 of detecting such violations, but the offense levels for antitrust offenses based on volume of commerce increase less rapidly than the offense levels for fraud, in part, because, on the average, the level of mark-up from an antitrust violation may tend to decline with the volume of commerce involved.

Id.

In 2005, the Commission again amended § 2R1.1 to raise the offense levels for antitrust violations and add additional steps to the volume of commerce table. U.S.S.G. app. C., amend. 678. The amendment was in response to Congress’s enactment of the Antitrust Criminal Penalty Enhancement and Reform Act of 2004, which increased from three to ten years the maximum term of imprisonment for antitrust violations under 15 U.S.C. § 1. U.S.S.G. app. C, amend. 678. The Act’s legislative history indicates that Congress increased the maximum penalties for antitrust violations to “harmonize[ ] the treatment of criminal antitrust offenders and other white collar criminals” and to send the message to antitrust offenders that “if they are caught they will spend much more time considering the consequences of their actions within the confinement of their prison cells.” 150 Cong. Rec. H3657 (daily ed. June 2, 2004) (statement of Rep. Sensenbrenner). The Commission noted Congress’s “concern about the inherent seriousness of antitrust offenses” and also explained that “[t]he penalties for sophisticated fraud have been increased incrementally due to a series of amendments to § 2B1.1, while no commensurate increases for antitrust offenses had occurred.” U.S.S.G. app. C., amend. 678. Since “[t]he Commission ha[d] long recognized the similarity of antitrust offenses to sophisticated frauds,” the Commission amended § 2R1.1 to ensure “that penalties for antitrust offenses will be coextensive with those for sophisticated frauds sentenced under § 2B1.1.” Id. According to the Commission, the amendment helped “restore the historic proportionality in the treatment of antitrust offenses and sophisticated frauds.” Id.
The history of and the amendments to § 2R1.1 exemplify the Commission’s institutional strengths. Indeed, in order to craft the original version of § 2R1.1, the Commission used empirical research as its baseline and then increased antitrust sentences in the interests of “greater rationality” and to avoid “inconsistency” between white-collar crimes and other property crimes. Rita, 551 U.S. at 349, 127 S.Ct. 2456. Thus, unlike the guideline at issue in Kimbrough, the antitrust guideline and its volume of commerce table were grounded in the Commission’s research, not plucked from a statute or based on mere assumptions. And, since originally crafting § 2R1.1, the Commission has amended the guideline in order to fulfill its duty to “constantly refine national sentencing standards.” Kimbrough, 552 U.S. at 108, 128 S.Ct. 558. It seems that the driving forces behind the Commission’s amendments to § 2R1.1 have been: (1) Congress’s amendments to the Sherman Act; and (2) the Commission’s desire to maintain the historic proportionality between antitrust and fraud sentences. Thus, unlike the 100:1 ratio at issue in Kimbrough, Congress and the Commission are apparently on the same page regarding antitrust sentences and the Commission’s continuing research has not eroded the underlying theories supporting the antitrust guideline.[15]
*1047 Given that the antitrust guideline is a product of the Commission’s institutional strengths, Kimbrough provides that a categorical variance based solely on a district court’s policy disagreement with the guideline may be subject to “closer review.” Id. at 109, 128 S.Ct. 558. After making this observation, the Supreme Court immediately noted that since the subject matter of its Kimbrough discussion was limited to the guidelines’ 100:1 powder/crack ratio, it had “no occasion for elaborative discussion” of instances dealing with guidelines that embody the Commission’s institutional strengths. Id. And it has not yet done so.
Cases and commentators have struggled a bit, as do I, with the reach of Kimbrough’s “closer review may be in order” language.[16] For some help, I turn to the Kimbrough opinion’s reference to oral ar *1048 gument in Gall, a case argued before the Supreme Court on the same day as Kimbrough. Id. at 109, 128 S.Ct. 558 (citing Tr. of Oral Arg. at 38-89, Gall v. United States, 552 U.S. 38, 128 S.Ct. 586, 169 L.Ed.2d 445 (2007)). From this reference, it is clear that the Court differentiated between judicial discretion arising from case-specific individualized features within the better discernment of the sentencing court and “I don’t agree with the policy of the guideline” emanations from the same source. Tr. of Oral Arg. at 39, Gall v. United States, 552 U.S. 38, 128 S.Ct. 586, 169 L.Ed.2d 445 (2007).
Reading the Supreme Court’s “closer review may be in order” language in context, and mainly applying the first of the two primary meanings of the word “may,”[17] it is clear that the Supreme Court presents this court with permission and discretion to impose “closer review” upon the district court’s idea that the policy espoused by the Sentencing Commission in § 2R1.1 is faulty. It is my view that there is little support for a substantial variance from a guidelines range calculated under § 2R1.1 based upon the district court’s misguided policy dispute with the Sentencing Commission. But, even assuming for the sake of argument that this ease properly presents a variance based both upon individualized factors within the better understanding of the sentencing judge and upon a validly formulated sentencing court policy disagreement with a Commission-created sentencing guideline, the variance must still be reviewed by this court under the correct standards of review outlined above, using the obvious grant of precedent-building leadership the Supreme Court delegated to the circuit courts in Kimbrough.
Today, the court majority does not apply “closer review” or explore its contours in any detail. Instead, the court applies only the deferential standard of review articulated in Feemster and finds that the dis *1049 trict court’s “policy disagreement with the antitrust guidelines ... [was a] permissible reason[ ] for varying from the guidelines.” Ante at 1037. As Judge Colloton’s concurring opinion in Feemster noted, however, the deferential standard of review articulated in Feemster did not address the “closer review” question left open in Kimbrough, which is at the heart of this case. Feemster, 572 F.3d at 468 n. 12 (Colloton, J., concurring). Accordingly, I would vacate this sentence and remand it for further consideration using only § 2R1.1 for initial guidance and for a greatly enhanced consideration of the institutional strengths of the Sentencing Commission implemented through much less consideration of the sentencing court’s stated anathema toward “greedy multi-millionaire businessmen,” assuming, without deciding, that such a person is before the court today.
Because of the sentencing court’s assault on the Sentencing Commission in this case, and by way of epilogue to this dissent, I have used the Commission’s annual source books to gather some statistics and create some tables, two of which I append to this dissenting opinion as examples. Since VandeBrake had a criminal history category of I and should have been sentenced under the current version of § 2R1.1, which became effective November 1, 2005, Table 1 depicts the mean and median sentences for antitrust offenders with a criminal history category of I between fiscal years (FYs) 2006 and 2010. During those years, the mean sentences for antitrust offenders fluctuated between 5.8 and 19.2 months, and the median sentences fluctuated between 5 and 14.5 months. Obviously, VandeBrake’s 48-month sentence is well above the five-year mean and median sentences for other antitrust offenders in the same criminal history category.
My research reveals that there were only a few hundred offenders sentenced for committing antitrust violations between FYs 1996 and 2011. The statistics also demonstrate that, over a period of 15 years, VandeBrake was the only antitrust offender sentenced above the guidelines range.[18] Indeed, out of some 230 offenders sentenced under § 2R1.1 since FY 1997, 83 were sentenced within the guidelines range and 146 were sentenced below the guidelines range. Similarly, since FY 1996, of the 288 offenders sentenced with an antitrust violation being the “primary offense,” 95 were sentenced within the guidelines range and 192 were sentenced below the guidelines range.[19]
*1050 While the district court did not discuss these particular statistics in its opinion, it did discuss the sentences handed down in several published antitrust opinions. VandeBrake, 771 F.Supp.2d at 1009-10. The court recognized that VandeBrake’s sentence was “higher than some recent sentences imposed for violations of the same statute,” but concluded that some disparity was to be expected given that it was the first court to ever vary above the antitrust guideline range based, in part, on policy grounds. Id. at 1011. To be sure, the Supreme Court has recognized that “some departures from uniformity” are to be expected as a result of its holding in Booker. Kimbrough, 552 U.S. at 108, 128 S.Ct. 558. But, the Court has also recognized that “uniformity remains an important goal of sentencing” and that “appellate review for reasonableness and ongoing revision of the [guidelines in response to sentencing practices will help to avoid excessive sentencing disparities.” Id. at 107, 128 S.Ct. 558 (emphasis added) (internal quotation omitted).
While we may no longer employ a “rigid mathematic formula that uses the percentage of a departure as the standard for determining the strength of the justifications required for a specific sentence,” Gall, 552 U.S. at 47, 128 S.Ct. 586, the Supreme Court “find[s] it uncontroversial that a major departure should be supported by a more significant justification than a minor one.” Id. at 50, 128 S.Ct. 586. Although district courts’ sentencing decisions are typically entitled to substantial deference, “[t]here is a difference ... between recognizing that another usually has the right of way and abandoning one’s post.” United States v. Kane, 639 F.3d 1121, 1136 (8th Cir.2011) (quotation omitted), cert. denied, — U.S. -, 132 S.Ct. 1590, 182 L.Ed.2d 221 (2012).
Here, VandeBrake’s 48-month sentence reflects a significant variance above his 21-to 27-month guidelines range under § 2R1.1, and his $829,715.85 fine is significantly higher than the guidelines range of $56,663.49 to $283,317.43.[20] For what it’s worth, VandeBrake’s non-binding plea agreement recommended a sentence of 19 months and a $100,000 fine. The district court attempted to justify VandeBrake’s 48-month sentence by emphasizing VandeBrake’s greed and by contrasting the guidelines ranges of §§ 2R1.1 and 2B1.1. The district court also increased VandeBrake’s fine to reflect the losses caused by VandeBrake and to ensure that, in light of VandeBrake’s wealth, the fine was punitive. VandeBrake, 771 F.Supp.2d at 1011-12.
The district court also explained that, if it did not vary upward, it would still issue a 48-month sentence by issuing consecutive sentences. Id. at 1013. It appears that the district court took this action to “bulletproof’ its sentence. After all, we have held that “the district court has broad statutory authority, pursuant to 18 U.S.C. § 3584, to impose consecutive terms.” United States v. Lone Fight, 625 F.3d 523, 525 (8th Cir.2010), cert. denied, - U.S. -, 131 S.Ct. 2474, 179 L.Ed.2d 1231 (2011). But, while issuing this alternative sentence, the district court incorporated its previous analysis of the § 3553(a) factors, which included its policy disagreement with § 2R1.1. VandeBrake, 771 F.Supp.2d at 1013. Therefore, any taint from the district court’s decision to *1051 vary upward under § 3553(a) would infect its alternative sentence.
As earlier noted, the district court committed procedural error and made guideline interpretations which the court majority has not subjected to de novo review. U.S.S.G. § 2R1.1 exemplifies the Commission’s institutional strengths and a “closer review” is in order in this case because the district court varied upward based, in part, on its policy disagreement with § 2R1.1. The greatest flaw in the court majority’s opinion is its failure to apply the “closer review” contemplated in Kimbrough, and its assumption that the standard of review articulated in Feemster applies in cases such as this. VandeBrake’s sentence is the first above-guidelines antitrust sentence in fifteen years because the district court found that the rationale underlying § 2Rl.l’s volume of commerce table did not apply. Under “closer review,” I would reverse VandeBrake’s 48-month sentence and remand for resentencing. Accordingly, I dissent.
APPENDIX
Table 1: Prison Sentences for Antitrust Offenders in Criminal History Category I Between FYs 2006 and 2010
Number of Offenders Sentenced to Fiscal Year Imprisonment_ Mean Months Median Months
2006 8 5.8
2007 11 19.2
2008 10.8
2009 12 18.2 14.5
2010 8 6.6 6.5
Source: U.S.S.C. Sourcebooks at http:// www.ussc.gov/Data_and_Statistics/ arehives.cfm.
Table 2: Antitrust Primary Offense Sentencing Trends (Post-Booker)
Fiscal Year Number of Offenders Sentences Within Sentenced Guidelines Range Upward Departure OR Variance Downward Departure OR Variance
2005 (Post-Booker) 11
2006 12 12
2007 15 13
2008 24 20
2009 20 20
2010 16 13
2011 (preliminary data) 10
Total 108 14 121 93
Source: U.S.S.C. Sourcebooks at http:// www.ussc.gov/Data_and_Statistics/ *1052 archives.cfm.

. "In reviewing a challenge to a sentence, we 'must first ensure that the district court committed no significant procedural error.’ ” United States v. Dace, 660 F.3d 1011, 1013 (8th Cir.2011) (quoting Gall v. United States, 552 U.S. 38, 51, 128 S.Ct. 586, 169 L.Ed.2d 445 (2007)). "[Procedural error” includes "failing to calculate (or improperly calculating) the [g]uidelines range.” Gall, 552 U.S. at 51, 128 S.Ct. 586.

. Specifically, the sentencing court started by calculating the "volume of commerce” attributable to VandeBrake at $5,666,348.61. VandeBrake, 771 F.Supp.2d at 971. Based on the volume of commerce table employed in the antitrust guideline, see U.S.S.G. § 2R1.1(b)(2), the court then calculated VandeBrake’s guidelines range at 21 to 27 months’ imprisonment. VandeBrake, 771 F.Supp.2d at 990. Because the sentencing court thought this range was "woefully inadequate,” id. at 999, it effectively scrapped the antitrust guideline in favor of the fraud guideline, § 2B1.1, which increases offense levels based on “loss” instead of "volume of commerce.” Id. at 1005. Faced with the inherent difficulty of calculating "loss” in this antitrust case, the district court consulted § 2Rl.l’s commentary regarding fine-setting for organizational antitrust offenders, which provides " '[i]t is estimated that the average gain from price-fixing is 10 percent of the selling price. The loss from price-fixing exceeds the gain....'” Id. (quoting U.S.S.G. § 2R1.1 cmt. 3). Based on this language, the district court theorized that the amount of "loss” caused by VandeBrake was more than ten percent of the volume of commerce — i.e., more than $566,634. Id. Then, employing some sort of guidelines alchemy, the court interjected its fabricated "loss” figure into the *1042 fraud guideline's loss table, U.S.S.G. § 2B1.1(b)(1), to arrive at a guidelines range of 46 to 57 months' imprisonment. VandeBrake, 771 F.Supp.2d at 1005, 1009. This erroneous transmogrification of the antitrust guideline increased VandeBrake's base offense level by fourteen levels as opposed to the two-level increase called for under § 2R1.1. Compare U.S.S.G. § 2R1.1(b)(2)(A) with id. § 2B1.1(b)(1)(H). When considering this bifurcated computation in light of the sentencing factors listed in 18 U.S.C. § 3553(a)(1), (2), the district court purported to discern the "need for substantial punishment above the [§ 2R1.1] guideline sentence.” VandeBrake, 771 F.Supp.2d at 1005. In essence, this exercise functioned as a categorical rejection of § 2R1.1 as a guideline useable in antitrust sentencing.

. I disagree with the majority's characterization that "[t]he crux of the district court’s policy disagreement" was the Commission’s rationale regarding the level of mark-up involved in antitrust violations. Ante at 1039. Indeed, "at the outset," before ever discussing levels of mark-up, the sentencing court opined that, “in [its] view,” the antitrust guideline was "overly lenient” and categorically "deserving of less deference.” VandeBrake, 771 F.Supp.2d at 1000-03. While doing so, the district court implied that § 2Rl.l's "overly lenient” sentences stem from the Sherman Act's historic preferential treatment of "wealthy, white, Anglo-Saxon, protestant males who were politically well-connected.” Id. at 1003. These emanations were cast against the backdrop of the first paragraph of the district court’s order, which characterized VandeBrake as a "wealthy, multi-millionaire businessm[a]n.” Id. at 965. As now-Justice Sotomayor wrote as a dissenting circuit judge in United States v. Cavern, "arbitrary and subjective considerations, such as a judge’s feelings about a particular type of crime, should not form the basis of a sentence.” 550 F.3d 180, 220 (2d Cir.2008) (en banc) (Sotomayor, J., dissenting); see also United States v. Irey, 612 F.3d 1160, 1211 (11th Cir.2010) (en banc), cert. denied, - U.S. -, 131 S.Ct. 1813, 179 L.Ed.2d 772 (2011) (ruling that a sentencing judge’s " 'conclusory statement of personal belief’ ” is insufficient to support a policy-based variance) (quoting United States v. Lychock, 578 F.3d 214, 220 (3d Cir.2009)).

. As explained in Kimbrough, the Commission's institutional strengths include its ability to base “determinations on empirical data and national experience, guided by a professional staff with appropriate expertise.” 552 U.S. at 109, 128 S.Ct. 558 (quotation omitted). In contrast, a sentencing court’s institutional strengths include its "greater familiarity with ... the individual case and the individual defendant before [it].” Id. (quotation omitted).

. To be sure, the sentencing judge's findings of fact are reviewed for clear error and, if we find no procedural error, we review the substantive reasonableness of the sentence for an abuse of discretion. Dace, 660 F.3d at 1013.

. For example, the Act set a five-year mandatory minimum sentence for defendants responsible for 5 grams of crack or 500 grams of powder, respectively. Kimbrough, 552 U.S. at 96, 128 S.Ct. 558.

. Section 2R1.1 was amended in 1989 to "eliminate minor gaps in the [volume of cornmerce] table.” U.S.S.G. app. C, amend. 211.

. The majority concludes that the antitrust guideline does not exemplify the Commission's institutional strengths and, therefore, applying closer review in this case "conflicts ... with Kimbrough itself.” Ante at 1038. This conclusion is based on the court’s apparent assumption that a guideline is not the *1047 product of the Commission’s inherent strengths if, occasionally over a period of twenty-five years, the Commission has amended the guideline due, in part, to congressional amendments to the guideline’s corresponding criminal statute. I find no support for this broad assumption in Kimbrough. Indeed, the Supreme Court went to great lengths in Kimbrough to distinguish the unique 100:1 powder/crack ratio from the vast majority of other guidelines which, like the antitrust guideline, were (1) based on an empirical analysis of past practices; (2) adjusted to avoid inconsistency and irrationality; and (3) have since been subjected to ongoing revision in response to sentencing practices. See Kimbrough, 552 U.S. at 94-100, 107, 128 S.Ct. 558.
The majority also contends that applying closer review in this case is contrary to the approach adopted by our sister circuits in United States v. Henderson, 649 F.3d 955 (9th Cir.2011), and United States v. Grober, 624 F.3d 592 (3d Cir.2010). In those cases, the courts held that, due to substantial congressional involvement, the child pornography guideline at issue was not the product of the Commission's institutional strengths. See Henderson, 649 F.3d at 962 ("Most of the revisions [to the child pornography guideline] were Congressionally-mandated and not the result of [the Commission's] empirical study.”); Grober, 624 F.3d at 608 (explaining that the child pornography guideline was “developed largely pursuant to congressional directives”). While a full-scale analysis of the child pornography guideline is not necessary here, I note that the view espoused in Henderson and Grober is not universal. See United States v. Pugh, 515 F.3d 1179, 1201 n. 15 (11th Cir.2008) (holding that the child pornography guidelines "do not exhibit the deficiencies the Supreme Court identified in Kimbrough ”). Assuming for the sake of argument that Grober and Henderson were based on sound reasoning, there are significant differences between the child pornography guideline and the antitrust guideline at issue here. In Grober, the court found that the Commission has repeatedly, but "sometimes reluctantly,” amended the child pornography guideline in response to explicit congressional directives. 624 F.3d at 607. Additionally, the court in Henderson emphasized that, in an unprecedented action, Congress itself directly amended the child pornography guideline in 2003. Henderson, 649 F.3d at 962. In contrast, Congress has never directly amended the antitrust guideline and, as discussed above, there is no indication that the Commission’s hand was unwillingly forced to amend the guideline or that the Commission's research does not support such amendments.
Finally, in Kimbrough the Court held that, because the 100:1 ratio and its "disproportionately harsh sanctions” did not exemplify the Commission’s institutional strengths, district courts could vary downward on that basis without abusing their discretion. 552 U.S. at 110, 128 S.Ct. 558 ("Given [the unique history of the 100:1 ratio], it would not be an abuse of discretion for a district court to conclude ... that the crack/powder disparity yields a sentence 'greater than necessary’ to achieve § 3553(a)’s purposes, even in a mine-run case.” (emphasis added)). Here, the majority finds that the Commission’s decision to consistently increase antitrust sentences above pre- and post-guidelines practice is not based on empirical research. See Ante at 1038. While such a conclusion would arguably support a downward variance under Kimbrough, it is not clear how this finding supports the district court's substantial upward variance.

. The Third Circuit has held that, to the extent a district court's sentence is based on a policy disagreement with the guidelines, "such a disagreement is permissible only if a [district [c]ourt provides sufficiently compel *1048 ling reasons to justify it.” Lychock, 578 F.3d at 219 (internal quotation omitted). And, in Irey, the Eleventh Circuit reversed a below-guidelines sentence under “closer review” where the sentence reflected an “unreasonable and a clear error in judgment.” 612 F.3d at 1203.
Finally, Third Circuit Judge D. Michael Fisher, in his article Stitt in Balance? Federal District Court Discretion and Appellate Review Six Years after Booker, commented:
The Supreme Court has actually provided further guidance in Gall and Kimbrough in the form of a heightened review. The courts of appeals should remember that these statements are valuable tools for defining the scope of substantive reasonableness, not hindrances to effective appellate review. By employing the heightened review imagined in Gall and Kimbrough, the courts of appeals can characterize "reasonableness” as a continuum, rather than a single point. Consequently, courts may shift to a closer form of reasonableness review when a particular sentence calls for it and to more deferential review when it does not. This tactic will be particularly useful in cases where district courts attempt to push the bounds of their discretion by imposing sentences well outside the advisory [gjuideline range, or where they try to shoehorn a new policy objection into the Kimbrough framework. By recognizing that a particular sentence may be subject to much closer scrutiny, district court judges will be encouraged to consider all of the relevant factors when making a sentencing determination, rather than imposing sentences that increase disparity.
49 Duq. L.Rev. 641, 672 (2011) (emphasis added).

. The term "may” has two primary meanings. First, "may” is used to denote permission or discretion. See Black’s Law Dictionary 1068 (9th ed. 2009) (defining "may” as "[t]o be permitted to”). Second, "may” could be used to refer to a possibility. See id. When used in this manner, however, "may” should be distinguished from "might”— "may” expresses likelihood whereas "might” expresses a stronger sense of doubt. Bryan A. Garner, Garner’s Modem Amencan Usage 529 (3d ed. 2009).

. The preliminary data for FY 2011 indicates that one antitrust offender was sentenced above the guidelines via an upward variance. Since VandeBrake was sentenced during FY 2011, I presume the lone above-guidelines sentence reported in 2011 is VandeBrake's sentence.

. According to the Department of Justice's website, VandeBrake's 48-month sentence for antitrust violations "tied the record for the longest jail sentence ever imposed on a defendant solely convicted of violating the antitrust laws.” Dep't of Justice, Antitrust Division Update, Spring 2011, available at http://www. justice.gov/atr/public/division-update/2011/ criminal-program.html. It appears that the other 48-month sentence was issued in United States v. Baci, 3:08-cr-00350-TJC-TEM (M.D.Fla.2008). In Baci, the government charged an executive of a Florida shipping corporation with rigging bids and fixing prices in the shipping industry over a six-year period, in violation of 15 U.S.C. § 1. Plea Agreement 2-5, ECF No. 18. Baci pled guilty pursuant to a plea agreement and conceded that the volume of commerce affected by his criminal conduct totaled over $1 billion. Id. at 7. The district court calculated Baci's guidelines range at 87 to 108 months and, based on Baci’s substantial assistance, granted the government's U.S.S.G. § 5K1.1 motion for a downward departure. Sentencing Tr. 8, 84, ECF No. 38. Ultimately, Baci was sentenced to 48 months' imprisonment and a $20,000 fine which, at the time, represented the longest jail term ever imposed for a single antitrust violation. Judgment 2-4, ECF No. *1050 43; Press Release, Dep’t of Justice, Former Shipping Executive Sentenced to 48 Months in Jail for His Role in Antitrust Conspiracy (Jan. 30, 2009), available at http://www. justice.gov/atr/public/press_releases/2009/ 242030.htm.

. U.S.S.G. § 2Rl.l(c) provides that, "[f]or an individual, the guideline fine range shall be from one to five percent of the volume of commerce, but not less than $20,000.”