**UNPUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

**No. 11-4071**

UNITED STATES OF AMERICA,

Plaintiff - Appellee,

v.

JOSEPH BERNARD BRUNSON,

Defendant - Appellant.

**No. 11-4072**

UNITED STATES OF AMERICA,

Plaintiff - Appellee,

v.

TIMOTHY MCQUEEN,

Defendant - Appellant.

**No. 11-4073**

UNITED STATES OF AMERICA,

Plaintiff - Appellee,

v.

TONY B. POUGH,

                Defendant - Appellant.

———————————

Appeals from the United States District Court for the District of South Carolina, at Columbia. Margaret B. Seymour, District Judge. (3:08-cr-00615-MBS-1; 3:08-cr-00615-MBS-2; 3:08-cr-00615-MBS-3;)

———————————

Argued: March 22, 2012           Decided: June 6, 2012

———————————

Before Sandra Day O'CONNOR, Associate Justice (Retired), Supreme Court of the United States, sitting by designation, TRAXLER, Chief Judge, and HAMILTON, Senior Circuit Judge.

———————————

Affirmed by unpublished per curiam opinion.

———————————

**ARGUED:** William Michael Duncan, AUSTIN, & ROGERS, PA, Columbia, South Carolina; Louis H. Lang, CALLISON, TIGHE & ROBINSON, LLC, Columbia, South Carolina; Parks Nolan Small, OFFICE OF THE FEDERAL PUBLIC DEFENDER, Columbia, South Carolina, for Appellants. Winston David Holliday, Jr., OFFICE OF THE UNITED STATES ATTORNEY, Columbia, South Carolina, for Appellee. **ON BRIEF:** William N. Nettles, United States Attorney, Jeffrey Mikell Johnson, Assistant United States Attorney, Robert F. Daley, Jr., Assistant United States Attorney, OFFICE OF THE UNITED STATES ATTORNEY, Columbia, South Carolina, for Appellee.

———————————

PER CURIAM:

Joseph Brunson, Timothy McQueen, and Tony Pough (collectively the Appellants) operated a Ponzi scheme that bilked investors out of more than $56,000,000.00. Following a jury trial, the Appellants were convicted of numerous offenses arising from this scheme. They raise three issues on appeal: (1) whether the district court erred when it appointed full-time counsel over their respective objections; (2) whether the district court erred in sentencing each of them to the low-end of their respective Guidelines range; and (3) whether the district court abused its discretion in keeping portions of a related civil receivership case sealed until after the trial. For the reasons stated below, we affirm.

I

From approximately September 2004 until August 2008, the Appellants, who refer to themselves as the "Three Hebrew Boys," operated a Ponzi scheme primarily through Capital Consortium Group (CCG), a business entity created to facilitate the scheme.[1] CCG offered investors, referred to as

---

[1] "Three Hebrews Boys" is a reference to the Book of Daniel, which contains the Old Testament story of Daniel's three friends, Shadrach, Meshach, and Abednego, who were ordered by King Nebechadnezzar to be thrown into a fiery furnace. Daniel's friends survived the experience through their faith in God. (Continued)

3

"constituents" by the Appellants, thousands of investment products, but the vast majority of these products related to either debt elimination or high-yield returns. The debt elimination products marketed by CCG guaranteed to eliminate the debt (e.g., mortgage, auto, credit card, or student loan) of the purchaser of the product. Typically, the purchaser agreed to pay up-front a fraction of the debt and agreed to wait a period of time before realizing any return on the investment. For its part, CCG agreed to eliminate the debt at the conclusion of this waiting period.

The high-yield return products offered what amounted to a fanciful return on the principal. For example, the "Short-Term Program" guaranteed that the investor would earn 10% per month on his or her principal until the end of the year at which time the investor was returned the principal. A 5% fee was charged up-front for this program. The "Long-Term Program" allowed investors to invest any amount, and, after ninety-one business days, they received 10% of their principal every month for the rest of their lives. A 5% fee was also charged up-front for this program. The "College Tuition Program" offered $100,000.00 toward four years of college tuition. The fees

Like Daniel's friends, the Appellants claim to have been thrown into a fiery furnace and survived as well.

4

charged depended on what grade the student was in at the time the money was invested. For example, if the student was a freshman in high school, for a $2,100.00 fee, the student would receive $25,000.00 per year for four years of college.

Like many Ponzi schemes, early investors received exceptionally high rates of return. Such returns, of course, were not generated by the success of the investment products, but rather through the contributions of new investors or from earlier investors who continued to invest their money. In fact, very little of the money received by CCG was invested at all.[2] Instead, the Appellants used the money for their personal use, to buy, among other things, real estate, a $1,000,000.00 RV, a Gulfstream jet, luxury cars, football stadium skyboxes, and other luxury personal items. The actual loss generated by the scheme was approximately $56,000,000.00.

Unfortunately, the individuals the Appellants targeted to invest in their fraudulent investment programs were church members, their families, and friends, and military service members, their families, and friends.[3] Investment seminars were

---

[2] Potential investors were told that CCG used "sweep accounts" to deposit money in foreign exchange markets, which, in turn, would yield extraordinarily high rates (sometimes in the neighborhood of 200% to 500% per day) of return.

[3] CCG held itself out as a "ministry" designed to free its clients from the bondage of debt. McQueen and Brunson both (Continued)

often held in churches and homes, and secrecy was a touchstone of the scheme--investors were required to sign a nondisclosure agreement which subjected them to a $1,000,000.00 fine if they disclosed the contents of the program.  Over 7,000 individuals were victimized by the actions of the Appellants, with an actual loss in excess of $56,000,000.00.

In August 2006, state law enforcement officers in South Carolina began to investigate CCG after receiving information from the North Carolina Secretary of State's office concerning a complaint filed with that office challenging the business practices of CCG.  In June 2007, a state search warrant was executed at CCG's offices in Columbia, South Carolina.  During the search, a thumb drive was seized which contained a spreadsheet listing the names and addresses of over 7,000 investors.  The spreadsheet showed that these investors invested over $82,000,000.00 in approximately 14,000 CCG programs.

On August 1, 2007, the government filed a sealed, ex parte motion for a preindictment restraining order to prevent the Appellants from disposing of assets related to CCG and to appoint a receiver who would identify and preserve CCG-related assets while the investigation into CCG was pending.  The following day, the district court entered a sealed order

received honorable discharges from the United States Army.

6

granting the government's motion. On August 31, 2007, the district court converted the restraining order into a preliminary injunction.

On September 5, 2007, the district court entered an order outlining the receiver's duties, as well as listing the Appellants' responsibilities concerning their cooperation with the receiver. Among other things, the order specified that the Appellants were to deliver property, monies, books, and records upon the receiver's demand and were to take no action, directly or indirectly, to hinder, obstruct, or otherwise interfere with the receiver in the conduct of his duties or with the custody, possession, management, or control by the receiver of the funds, assets, or premises involved in the case.

On May 27, 2008, a criminal complaint against the Appellants was filed in the United States District Court for the District of South Carolina. On June 20, 2008, a federal grand jury in the District of South Carolina returned an indictment charging the Appellants with one count of conspiracy to commit mail fraud under 18 U.S.C. §§ 1341 and 1349 (Count One) and thirty-five substantive counts of mail fraud under 18 U.S.C. §§ 1341 and 2 (Counts Two to Thirty-Six). The indictment also included a number of criminal forfeiture counts.

On August 21, 2008, the grand jury returned a superseding indictment against the Appellants which added ten

counts of transporting stolen funds in interstate commerce under 18 U.S.C. §§ 2314 and 2 (Counts Thirty-Seven to Forty-Six) and twelve counts of money laundering under 18 U.S.C. §§ 1957 and 2 (Counts Forty-Seven to Fifty-Eight).

Prior to trial in the criminal case, the district court released certain deposition transcripts in the receivership case to the Appellants. On October 28 and November 2, 2009, McQueen and Pough filed motions to unseal the remainder of the receivership case.

A jury trial began on November 10, 2009 and concluded on November 20, 2009. The jury returned a verdict of guilty on all counts. The jury also returned an $82,000,000.00 forfeiture verdict against the Appellants.

On November 29, 2009, the district court granted in part and denied in part the motions to unseal the remainder of the receivership case. In its order, the district court ruled that certain documents generated "for the court's eyes only" and those "concern[ing] grand jury matters" would remain sealed.

The district court conducted the Appellants' sentencing hearing on December 14, 2010. By a judgment entered on January 14, 2011, the district court sentenced Pough to a total of 360 months' imprisonment and sentenced Brunson and McQueen each to a total of 324 months' imprisonment. The Appellants filed timely notices of appeal.

The principal claim raised by the Appellants concerns the district court's decision appointing full-time counsel in January 2009 over their objections. According to the Appellants, this decision violated their Sixth Amendment right to counsel. Before turning to the relevant law concerning this claim, we set forth the relevant facts.

A

On June 3, 2008, at the Appellants' detention hearing in the criminal case, a United States Magistrate Judge provisionally appointed the same three attorneys who had represented the Appellants in the receivership case. During an attorney status conference on June 23, 2008, the magistrate judge relieved provisionally appointed counsel based on the Appellants' indication that they wanted to proceed pro se.

On July 21, 2008, the government filed a motion for the district court to appoint standby counsel to assist the Appellants. On July 29 and 30, 2008, prior to a hearing on the government's motion, the Appellants filed several nonsensical pro se motions. These motions were styled as a "Motion to Dismiss [Pursuant to] F.R.C.P. 12," a "Third-Party Complaint in Rem," a "Notice and Demand Without Dishonor for Discovery by Interrogatory for the Record," and a "Demand to Quash Due to

Assuming Facts Not in Evidence, Falsification of the Record, Withholding Exculpatory Evidence, and Denial of Due Process & Fraud."

In these voluminous filings, the Appellants raised various nonsensical and frivolous claims attacking the jurisdiction of the district court. For example, the Appellants claimed that the United States District Court for the District of South Carolina "is a privately owned Commercial Corporation" and that the United States is a "501C3 NON PROFIT OR RELIGIOUS CORPORATION or CHARITABLE TRUST." The Appellants insisted that they were entitled to full payment and the surrender of "Corporate Surety Bonds" that the government owed for non-payment of gift and estate taxes. The Appellants also contended that they were "Civilly Dead under the Doctrine of Mortmain or Deadhand as designated in French."[4]

On August 11, 2008, the magistrate judge conducted a hearing on the government's motion to appoint standby counsel for the Appellants. During this hearing, the Appellants each refused to acknowledge that they were the defendants in the case. When addressed by the magistrate judge, Brunson asked for

---

[4] Mortmain, French for "deadhand," generally refers to land that is held "in perpetuity by an ecclesiastical or other corporation." Black's Law Dictionary 1035 (8th ed. 1999). A mortmain statute typically is designed to prevent such entities from holding land in perpetuity. Id.

10

clarification whether the magistrate judge was addressing the "defendant or . . the live, breathing man, Joseph Brunson." Brunson claimed that he was appearing by "special visitation," as a "third party intervenor," and/or as a "cross plaintiff." McQueen and Pough made similar nonsensical claims. At the conclusion of the hearing, the magistrate judge appointed the Appellants' three previous attorneys as standby counsel and informed the Appellants that they could "take advantage of their abilities and skills and knowledge or not."

On August 18, 2008, the district court held a hearing on various motions filed by the Appellants. The Appellants again announced that they were not the defendants and were not under the district court's jurisdiction, arguing that the indictment had been filed against a corporation spelled in all capital letters whereas they spelled their names in upper-case and lower-case letters. When invited by the district court to offer argument in support of their motions, the Appellants recited a litany of nonsensical claims. Based on these claims, the district court advised the Appellants to retain counsel or to take advantage of the services of their appointed counsel. The district court then denied the Appellants' motions.

On August 22, 2008, a day after the superseding indictment was returned, the Appellants filed additional pro se motions to quash the indictment, again arguing that the district

court lacked jurisdiction. The same day, the Appellants filed a pro se notice of appeal from the district court's denial of their motions on August 18, 2008. On February 24, 2009, we dismissed this interlocutory appeal.

On September 26, 2008, the Appellants filed yet another pro se motion in the district court. In the motion, titled "Ex Parte For Declaratory Judgment and Relief," the Appellants indicated that they were sovereigns not subject to the district court's jurisdiction.

On January 5, 2009, the government filed a motion to have standby counsel appointed as full-time counsel for all three of the Appellants. In the motion, the government outlined the Appellants' disruptive and obstructive conduct. The district court held a hearing on the government's motion on January 29, 2009. At the hearing, Brunson refused to acknowledge that he was a defendant in the case. Instead, he claimed that he was the "attorney in fact for the defendant Joseph Bernard Brunson," appointed by the defendant "Joseph Bernard Brunson." For his part, McQueen claimed the criminal case was "settled and closed" and that he was not there as a defendant in the criminal case, but rather wished to proceed "sui juris" on behalf of the defendant Timothy McQueen named in

12

the indictment.[5]  Pough took a similar approach to that of McQueen.  At the conclusion of the hearing, the district court granted the government's motion, opining that the Appellants engaged in disruptive and obstructive conduct necessitating the appointment of full-time counsel.  In so ruling, the district court left the door open for the Appellants to secure substitute counsel, if they decided to retain counsel on their own.

Unhappy with the district court's ruling, the Appellants, shortly thereafter, moved to rescind the order appointing full-time counsel.  A hearing on this motion was held on May 7, 2009.  At the hearing, the district court observed that a trial could not proceed without the appointment of full-time counsel because the Appellants refused to acknowledge they were the defendants named in the indictment.  Along a similar vein, the district court observed that the trial could not move forward because the Appellants would not even acknowledge who was "talking" to the district court.  At the conclusion of the hearing, the district court denied the motion, relying, again, on the Appellants' disruptive and obstructive behavior.

On October 27, 2009, the Appellants began to flood the district court with another barrage of pro se filings.  These

---

[5] "Sui juris" means in his "own right," Black's Law Dictionary 1475 (8th ed. 1999) and is usually applied in a civil context to denote that a party is of full age and capacity. Cain v. Vontz, 703 F.2d 1279, 1281 (11th Cir. 1983).

included motions for "Abatement of Proceeding Pending Administrative Proceeding to Settle Matter," notices of termination of appointed counsel, and "Request[s] for Forgiveness." The district court conducted a pretrial conference the same day as these filings. Brunson claimed that he was appearing as "Joseph Brunson, intervenor, here in the matter for Joseph Brunson the defendant." Brunson also claimed that he was appearing as intervenor "to assist the parties to settle all claims and charges outstanding to this matter." Brunson also refused to come to the podium unless the district court acknowledged that he was "Joseph Brunson, intervenor." Like Brunson, McQueen and Pough claimed to appear at the hearing as "intervenors." Like many times before, the Appellants continued to press frivolous and nonsensical arguments. They also insisted that they wanted to dismiss their appointed counsel and settle the case "administratively." When the district court advised the Appellants that they needed to talk with their appointed counsel if they were interested in plea negotiations, the Appellants stated that they "would conditionally accept [the] offer if [counsel was willing] to accept all liability." The district court denied all of the Appellants' frivolous motions, as well as the request to relieve appointed counsel.

14

The Appellants' disruptive and obstructive conduct continued all the way to the trial. During a hearing on the day of jury selection, Brunson repeatedly pressed nonsensical and frivolous arguments, arguing that he was not a defendant in the case and that the district court did not have jurisdiction. At one point during yet another challenge to the district court's jurisdiction, the district court observed that Brunson was "out of order." McQueen and Pough joined these arguments, which ultimately were rejected by the district court.

B

The Sixth Amendment guarantees a criminal defendant the right to "the Assistance of Counsel for his defence." U.S. Const. amend. VI. This right guarantees criminal defendants the right to trial counsel and also the right to self-representation. Faretta v. California, 422 U.S. 806, 835 (1975). The right of self-representation generally must be honored even if the district court believes that the defendant would benefit from the advice of counsel. Id. at 834.

The right to self-representation, however, "is not absolute." Indiana v. Edwards, 554 U.S. 164, 171 (2008). "[T]he trial judge may terminate self-representation by a defendant who deliberately engages in serious and obstructionist misconduct." Faretta, 422 U.S. at 834 n.46. "The right of

15

self-representation is not a license to abuse the dignity of the courtroom" or "a license not to comply with relevant rules of procedural and substantive law." Id.; see also United States v. Frazier-El, 204 F.3d 553, 560 (4th Cir. 2000) ("The right [to self-representation] does not exist . . . to be used as a tactic for delay, for disruption, for distortion of the system, or for manipulation of the trial process.").

In this case, the district court had sufficient grounds to revoke the Appellants' pro se status and appoint full-time counsel for them. Throughout this case (and in the receivership case as well), the Appellants disrupted the proceedings, making it difficult, if not impossible, for the district court to try the case without the appointment of full-time counsel. By the time the district court appointed full-time counsel for the Appellants, the Appellants had filed numerous nonsensical pro se motions, and the district court had presided over numerous hearings in which the Appellants put forth such nonsensical arguments. From the get-go, the Appellants refused to acknowledge that they were the defendants named in the indictment, indicating instead that they were the "intervenors." Under such circumstances, it was impossible for the district court to conduct any type of meaningful dialogue with the Appellants, and, without such dialogue, it was impossible for the district court to try the case. Moreover,

16

after the district court's January 2009 ruling, the Appellants gave the district court no indication that they were willing to stop their disruptive and obstructive conduct. At the hearing on the day of jury selection, the Appellants continued to claim they were not defendants in the case and that the district court did not have jurisdiction. In sum, under the circumstances before it, the district court certainly acted within its discretion when it appointed full-time counsel to thwart the Appellants' ongoing manipulative effort to delay and disrupt the criminal trial.

In the alternative to their argument that the circumstances in January 2009 did not justify the appointment of full-time counsel, the Appellants suggest the government was required to wait until the beginning of trial to make the appointment of full-time counsel motion. We reject this argument. Numerous courts understandably have permitted district courts to revoke a defendant's pro se status prior to trial. United States v. Mabie, 663 F.3d 322, 329 (8th Cir. 2011) (upholding the pretrial revocation of a defendant's pro se status); United States v. Mosley, 607 F.3d 555, 558-59 (8th Cir. 2010) (same). To hold otherwise flies in the face of common sense. By the time of trial, the government has incurred the expense of bringing the case to trial (securing witnesses, etc.), and it would materially prejudice the government to

17

require it to wait until the beginning of the trial to move for the appointment of full-time counsel. Moreover, requiring the government to wait until the beginning of trial also places a burden on the district court, which will in all likelihood have to continue the trial to allow appointed counsel time to get familiar with the case. In short, embracing the Appellants' position here would permit them, and similar defendants, to distort the trial process in contravention to the admonition in Frazier-El that the right of self-representation cannot be so employed.

III

The Appellants also challenge the district court's decision to keep portions of the receivership case sealed during their trial. The Appellants do not allege that any particular prejudice flowed from this district court action. Rather, they contend that the district court's decision to keep portions of the receivership case sealed during the trial amounts to structural error requiring reversal.

In support of their structural error argument, the Appellants rely on Arizona v. Fulminante, 499 U.S. 279 (1991), wherein the Court noted five structural errors that mandate automatic reversal of a conviction: denial of counsel, trial by a biased judge, the right to self-representation at trial,

18

exclusion by race from a grand jury, and denial of a public trial. The five "structural errors" listed in Fulminante, as well as a few others that have since been recognized, mandate automatic reversal because such errors "call into question the very accuracy and reliability of the trial process." McGurk v. Stenberg, 163 F.3d 470, 474 (8th Cir. 1998).

The Appellants recognize that the error they allege "does not fit neatly into Supreme Court structural error jurisprudence." Appellants' Br. at 46. Nevertheless, they suggest the manner in which the district court handled the receivership case implicates their Sixth Amendment right to a public trial. According to the Appellants, because portions of the receivership case remained sealed, their trial was not a public trial.

The Sixth Amendment guarantees a defendant the right to a public trial. U.S. Const. amend. VI; Presley v. Georgia, 130 S. Ct. 721, 724 (2010); Press-Enterprise Co. v. Superior Court of Cal., 464 U.S. 501, 511 (1984). This right is premised on the notion that "'judges, lawyers, witnesses, and jurors will perform their respective functions more responsibly in an open court than in secret proceedings.'" Waller v. Georgia, 467 U.S. 39, 46 n.4 (1984) (quoting Estes v. Texas, 381 U.S. 532, 588 (1965) (Harlan, J., concurring)). The right "is for the benefit of the accused; that the public may see he is fairly dealt with

and not unjustly condemned, and that the presence of interested spectators may keep his triers keenly alive to a sense of their responsibility and to the importance of their functions." Id. at 46 (citations and internal quotation marks omitted); see also In re Oliver, 333 U.S. 257, 270 (1948) ("The knowledge that every criminal trial is subject to contemporaneous review in the forum of public opinion is an effective restraint on possible abuse of judicial power.").

"The central aim of a criminal proceeding [is] to try the accused fairly," and the right to a public trial serves the purpose of "ensuring that judge and prosecutor carry out their duties responsibly . . . , encourag[ing] witnesses to come forward[,] and discourag[ing] perjury." Waller, 467 U.S. at 46. Thus, "[t]he right to a public trial is not only to protect the accused but to protect as much the public's right to know what goes on when men's lives and liberty are at stake, for a secret trial can result in favor to as well as unjust prosecution of a defendant." Lewis v. Peyton, 352 F.2d 791, 792 (4th Cir. 1965).

Here, undeniably, the Appellants enjoyed a public trial. There is no allegation that the courtroom was closed for any meaningful duration, thus, it remained open to the public, ensuring that the trial was subject to contemporaneous review in the court of public opinion. Cf. Press-Enterprise, 464 U.S. at 509 (noting that trial closures are to be "rare and only for

20

cause shown that outweighs the value of openness"). Moreover, the fact that portions of the receivership case remained sealed is of no moment. The government did not use, at trial or at sentencing, information contained in the receivership case or information that was not previously disclosed to the Appellants. Thus, the government's evidence at trial was subject to scrutiny through both cross-examination and assessment by the public at large. Cf. Waller, 467 U.S. at 46 ("[T]here can be little doubt that the explicit Sixth Amendment right of the accused is no less protective of a public trial than the implicit First Amendment right of the press and public."). Finally, from our review of the record, it is clear that both the government and the district court handled their respective duties fairly and responsibly.[6]


IV

The Appellants also challenge their sentences. The gist of their challenge is that the district court abused its discretion when it refused to embrace their argument premised on a policy disagreement with the Fraud Guideline.

---

[6] The Appellants also argue that the district court violated their right to due process under the Fifth Amendment when it kept portions of the receivership case sealed during the course of their trial. We have reviewed this argument and find it to be without merit.

21

Prior to sentencing, a presentence investigation report (PSR) was prepared for each appellant. The Guidelines calculations in the PSRs were similar in all material aspects, except for the Criminal History Category. Pough's Criminal History Category was II, while Brunson's and McQueen's was I. The total offense level for each appellant was 41, calculated as follows. The base offense for the substantive mail fraud counts was 7, United States Sentencing Commission Guidelines Manual (USSG) § 2B1.1(a)(1).[7] Twenty-four levels were added because the loss exceeded $50,000,000.00 but was less than $100,000,000.00, id. 2B1.1(b)(1)(M). Six levels were added because the offense involved more than 250 victims, id. 2B1.1(b)(2)(C). Two levels were added because the offense involved sophisticated means, id. 2B1.1(b)(9)(C), and two levels were added for obstruction of justice, id. 3C1.1.

At sentencing, the Appellants pressed an argument based on a policy disagreement with the Fraud Guideline. According to the Appellants, Guideline sentences for fraud

---

[7] All of the counts of conviction were grouped pursuant to USSG § 3D1.2(c), which deals with groups of closely-related counts, because all of these counts were indeed closely related. According to USSG § 3D1.3(a), when counts are grouped pursuant to USSG § 3D1.2(a) through (c), the highest offense level of the counts in the group is used. Here, the counts relating to mail fraud produced the highest offense level and, therefore, were used for total offense level calculation purposes.

offenses are too high, are not based on past practice or empirical data, and have been increasingly rejected by sentencing courts in high-loss fraud cases. The Appellants also suggested that the Fraud Guideline has an excessive number of enhancements, many of which are overlapping and duplicative. The district court filed a detailed sentencing memorandum for each appellant explaining why, after consideration of the 18 U.S.C. § 3553(a) factors, a sentence at the low-end of the Guidelines range was appropriate. In particular, the district court rejected the Appellants' argument resting on their policy disagreement with the Fraud Guideline, holding that the circumstances of each case did not warrant a sentence outside of the Guidelines range. On appeal, the Appellants continue to press their policy-based arguments rejected by the district court below.

B

We review a sentence for reasonableness, applying the abuse of discretion standard. Gall v. United States, 552 U.S. 38, 51 (2007). This review requires consideration of both the procedural and substantive reasonableness of the sentence. Id. We assess whether the district court properly calculated the advisory Guidelines range, considered the factors set forth in 18 U.S.C. § 3553(a), analyzed any arguments presented by the

23

parties, and sufficiently explained the selected sentence. <u>Id.</u> at 49-50; <u>United States v. Lynn</u>, 592 F.3d 572, 575-76 (4th Cir. 2010). If there is no procedural error, we review the substantive reasonableness of the sentence, "examin[ing] the totality of the circumstances to see whether the sentencing court abused its discretion in concluding that the sentence it chose satisfied the standards set forth in § 3553(a)." <u>United States v. Mendoza-Mendoza</u>, 597 F.3d 212, 216 (4th Cir. 2010). If the sentence is within the Guidelines range, we apply a presumption of reasonableness. <u>Rita v. United States</u>, 551 U.S. 338, 346-56 (2007) (upholding presumption of reasonableness for within-Guidelines sentence).

In this case, the sentences imposed by the district court are both procedurally and substantively reasonable. With respect to each appellant, the district court properly calculated the advisory Guidelines range, considered the factors set forth in 18 U.S.C. § 3553(a), analyzed any arguments presented by the parties, and sufficiently explained the selected sentence in detailed sentencing memorandums. Moreover, the totality of the circumstances demonstrate that the chosen sentences satisfied the standards in 18 U.S.C. § 3553(a). Finally, with respect to the policy disagreement raised by the Appellants, while it is true that a district court may vary from Guidelines ranges based solely on policy considerations,

24

including disagreements with the Guidelines, <u>Kimbrough v. United States</u>, 552 U.S. 85, 101 (2007), it is equally true that a district court is not required to do so. See <u>United States v. Munjak</u>, 669 F.3d 906, 907 (8th Cir. 2012) ("That a district judge now may be permitted to deviate from the guidelines based on a policy disagreement with the Sentencing Commission, however, does not mean that the judge is required to do so."); <u>United States v. Henderson</u>, 649 F.3d 955, 964 (9th Cir. 2011) ("[D]istrict courts are not obligated to vary from the child pornography Guidelines on policy grounds if they do not have, in fact, a policy disagreement with them."); <u>United States v. Mondragon-Santiago</u>, 564 F.3d 357, 367 (5th Cir. 2009) ("In appropriate cases, district courts certainly may disagree with the Guidelines for policy reasons and may adjust a sentence accordingly. But if they do not, we will not second-guess their decisions under a more lenient standard simply because the particular Guideline is not empirically-based."); <u>United States v. Wilken</u>, 498 F.3d 1160, 1172 (10th Cir. 2007) (noting that "a sentence is not rendered unreasonable merely because of a district court's refusal to deviate from the advisory [G]uideline range based on disagreements with the policies underlying a particular Guideline provision.") (citation and internal quotation marks omitted). Here, the district court acted within its discretion when it declined to embrace the

25

policy disagreements raised by the Appellants.

V

For the reasons stated herein, the judgments of the district court are affirmed.

AFFIRMED

26